**SYKES LABORATORY, INC., Plaintiff,**

v.

**Russ KALVIN dba Consumer Products Associates Distr., and Sunshine Beauty Supplies, Inc., Defendants.**

**No. CV 84–3428 RG(JRx).**

United States District Court,
C.D. California,
Los Angeles Division.

June 3, 1985.

Charles E. Wills, Los Angeles, Cal., for plaintiff.

William C. Conkle and Mark D. Kremer, Conkle & Olesten, Los Angeles, Cal., for defendants.

## OPINION AND ORDER GRANTING PARTIAL SUMMARY JUDGMENT

GADBOIS, District Judge.

Plaintiff Sykes Laboratory, Inc. ("Sykes") manufactures and sells a fingernail conditioner which it calls "Sykes' 'Perfect Nail.'" Defendant Sunshine Beauty Supplies, Inc., ("Sunshine") markets low cost versions of name-brand beauty products, including the plaintiff's, under the label, "the GENERIC BRAND." Defendant Russ Kalvin is the president of Sunshine. In packaging their goods defendants use the tradenames and trademarks of their competitors to identify the defendants' products as inexpensive substitutes for the better known, name-brand items they have copied.

In this action plaintiff charges that Sunshine's use of the name, "Sykes", and the mark, "Perfect Nail," violates both federal and state law regarding trademark protection. The complaint contains five claims for relief. Sykes' first and second claims allege unfair competition under California law by reason of defendants' reference to plaintiff's product name in the phrase, "the GENERIC BRAND Version of Sykes' Perfect Nail." These claims allege in essence that defendants have unlawfully misappropriated the goodwill Sykes has built up in its name and mark by benefiting from the labor and expense plaintiff invested in developing and promoting its product. Plaintiff's third claim is for dilution of its trademark under California law. Plaintiff's fourth and fifth claims allege trademark infringement and unfair competition, respectively, on the basis of Sunshine's use of a container identical to plaintiff's, which is registered with the trademark office, in bottling the generic nail hardener.

This court's subject-matter jurisdiction is founded both on diversity of citizenship, 28 U.S.C. § 1332 (1982), with regard to the state-based causes of action and on the presence of a federal question as to the trademark infringement claim, 28 U.S.C. §§ 1331 and 1338(a) (1982).

The matter came before this court on December 3, 1984, for a hearing on defendants' motions for judgment on the pleadings on plaintiff's first and second claims, for summary judgment on plaintiff's third through fifth claims, and for an order cancelling the trademark registration of Sykes' bottle design pursuant to section 37 of the Lanham Act, 15 U.S.C. § 1119 (1982). The court has reviewed the papers and affidavits filed by the parties and carefully considered their arguments. As indicated at length below, the court will grant

these motions except as to the third claim for relief.

The basic facts necessary to decide the pending motions are undisputed and can be summarized readily:

Both Sykes' Perfect Nail and defendant's generic version are unpatented potions used for conditioning and hardening fingernails. Plaintiff has been selling its product since at least 1972 in both a one-quarter ounce bottle for retail use and a one ounce bottle for professional use by manicurists. Plaintiff has spent more than $250,000 in promoting Perfect Nail and has enjoyed total sales of more than $5 million. According to numerous letters plaintiff has received and filed with the court as exhibits, praise for Perfect Nail has flowed in from various quarters, including Her Royal Highness, the Duchess of Windsor.

Defendant Russell Kalvin and his wife Marilyn established Sunshine Beauty Supplies in 1974 after having been involved in the sale of beauty supplies with various prominent manufacturers for some twelve years. Originally acting as a retail and wholesale beauty supply store for well known brands, Sunshine began in 1976 or 1977 to market its own versions of those products under the labels, "Apples'" and, more recently, "the GENERIC BRAND." Defendants' copy of Sykes' Perfect Nail entered the market in late 1981 or early 1982. The defendants list the Sykes' product along with several dozen other namebrands on a comparison chart which boasts, "If You Like the Name Brand, You'll Love the GENERIC BRAND."

Both Sykes' Perfect Nail and the Generic Brand are sold in small, banjo-shaped vials, identical except that defendants' has a white cap while plaintiff's has a black one. Defendants' bottle bears a label with the block-letter words, "the GENERIC BRAND tm Version of Sykes' 'Perfect Nail' (R)" and "NAIL HARDENER # 82–001" printed beneath. Plaintiff's bears a simple, script label, "Perfect Nail."

The vials, however, are sold in dissimilar packages. The box containing plaintiff's nail hardener is gold with thick black lettering; Sunshine's box is white with blue lettering and the phrase that Sykes object to—"the GENERIC BRAND Version of Sykes 'Perfect Nail'"—appears not on the main part of the box but rather on a flap attached at the top and designed for hanging on a display rack.

Although a fraction of plaintiff's product has been sold in past years in a so-called window-box displaying the purportedly distinctive bottle, defendant's product is contained in a sealed package. The vial is thus not visible to a consumer comparing the parties' products. Further, Sunshine has never used the bottle shape in advertising or marketing its nail hardener.

The top of the package containing the defendants' version bears the same label as the vial. On the front of the box defendants have conspicuously placed a disclaimer:

Dear Consumer,

We invite you to compare our nail hardener's color, texture, fragrance, and performance with Sykes "Perfect Nail".

Our company is not connected in any way with the name brand company or its suppliers. We don't represent that our products are identical in every respect with the name brand company's.

If not totally satisfied, return to place of purchase for full refund.

Good manicuring!

RUSS KALVIN
President

In very small print on another side of the box and underneath the directions for using the nail hardener, defendants' package identifies its producer as "Consumer Products Associates Distr."

1. *Defendants' motion for judgment on the pleadings as to plaintiff's first and second claims for relief.*

Plaintiff alleges in its first and second claims that defendants have engaged in unfair competition under both the common law and under section 17,200 of the California Business and Professions Code, Cal. Bus. & Prof.Code § 17,200 (West Supp.

1985), by misappropriating the goodwill of the mark and name Sykes' Perfect Nail. Plaintiff contends that consumers of nail conditioners have been buying defendants' product only because they recognize plaintiff's distinctive name and not by reason of any goodwill defendants may have independently developed, and that defendants have thus unfairly benefitted from plaintiff's labors. Plaintiff nowhere alleges, however, that purchasers have been or are likely to be confused by defendants' use of plaintiff's name and mark on the box for its generic version.

Defendants move for judgment on the pleadings under federal rule of civil procedure 12(c), Fed.R.Civ.P. 12(c). They contend that in this circuit a claim for unfair competition may not be founded upon misappropriation of goodwill in the trademark of an unpatented product unless confusion or deception results. Plaintiff, in response, seeks to bring its unfair competition claim under that line of cases, most notably *International News Services v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), in which courts have prohibited wholesale misappropriation of the products of one's competitor's time, effort and money. Defendants should not reap, plaintiff argues, where they have not sown.

Because the plaintiff's opposition to this motion relies in part on matters outside the pleadings in this case, the court has treated this motion as one for summary judgment. Fed.R.Civ.P. 12(c)[1] Having carefully reviewed the affidavits, declarations, and other papers presented by both sides, the court concludes that defendants are entitled to judgment as a matter of law. *Dalke v. Upjohn Co.*, 555 F.2d 245, 248 (9th Cir.1977). This result is required by certain well established principles of this circuit delimiting the laws of unfair competition.[2]

The gist of any unfair competition action based on the adoption of a rival's trademark must always be the likelihood of confusion or deception. As the United States Court of Appeals for the Ninth Circuit has stated:

> Trade-mark and trade name infringement, or unfair competition, preclude one from using another's distinctive mark or name if it will cause a likelihood of confusion or deception as to the origin of the goods.... Whether we call the violation infringement, unfair competition, or false designation of origin, the test is identical—is there a "likelihood of confusion"?

*New West Corp. v. NYM Co. of Cal.*, 595 F.2d 1194, 1201 (9th Cir.1979) (citations omitted); *accord Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 760 (9th Cir.1978), *cert. denied sub nom. O'Neill v. Walt Disney Productions*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979); *see*

---

1. Even if this court were to exclude the matters outside the pleadings and continue to treat this motion as one for judgment on the pleadings, the result would be the same.

    The standards to be applied on a motion under 12(c) are set out in *Austad v. United States*, 386 F.2d 147 (9th Cir.1967):

    > For purposes of a motion for judgment on the pleadings, all allegations of fact of the opposing party are accepted as true.... The allegations of the moving party which have been denied are taken as false.... Only if it appears that, on the facts so admitted, the moving party is clearly entitled to prevail can the motion be granted.

    *Id.* at 149 (citations omitted).

2. State law creates rights distinct from those under federal law and may afford trademark owners broader protection under the rubric of unfair competition than does section 43 of the Lanham Act, 15 U.S.C. § 1125(a) (1982). *See*

*International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 916 (9th Cir.1980). In this case plaintiff presses its first and second claims under the California Business and Professions Code, section 17,200, Cal.Bus. & Prof. Code § 17,200 (West Supp.1985). The court recognizes that the state tribunals have afforded a very broad interpretation to the language of this section defining "unfair competition" to include any "unlawful, unfair or fraudulent business practice." *See Barquis v. Merchants Collection Ass'n of Oakland*, 7 Cal.3d 94, 111, 101 Cal.Rptr. 745, 757, 496 P.2d 817, 829 (1972) ("[T]he Legislature ... intended by this sweeping language to permit tribunals to enjoin ongoing wrongful business conduct in whatever context such activity might occur.") In this case, however, the theories plaintiff pursues under its first and second claims are so clearly contrary to existing law of this circuit that even the broad scope of section 17,200 is of no avail to plaintiff.

*Plotkin v. Tanner's Vacuums*, 53 Cal. App.3d 454, 459, 125 Cal.Rptr. 697, 700 (1975) ("[T]he essential test of unfair competition is whether or not the challenged activity is likely to deceive the public.").

The requirement that a plaintiff prove a likelihood of confusion in order to recover on an unfair competition claim follows from "the traditionally accepted premise that the only logically relevant function of a trademark is to impart information as to the source of sponsorship of the product." *Smith v. Chanel*, 402 F.2d 562, 566 (9th Cir.1968). Thus protection does not normally extend to "trademark's commercially more important function of embodying consumer good will created through extensive, skillful, and costly advertising." *Id.; see Anti-Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 301 (9th Cir.1979), *cert. denied sub nom. CPG Products Corp. v. Anti-Monopoly, Inc.*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983) ("It is the source-denoting function which trademark law protects and nothing more.")

■ Beginning with the seminal case of *Smith v. Chanel* the Court of Appeals has repeatedly held, accordingly, that a manufacturer who duplicates an unpatented product sold under a trademark may then use that trademark in advertising the copied product. *Smith v. Chanel*, 402 F.2d at 563–66; *Monte Carlo Shirt, Inc. v. Daewoo International (America) Corp.*, 707 F.2d 1054, 1057 n. 3 (9th Cir.1983); *Anti-Monopoly*, 611 F.2d at 301 n. 2; *SSP Agricultural Equipment, Inc. v. Orchard-Rite Ltd.*, 592 F.2d 1096, 1103 (9th Cir.1979). The sole limitation on this freedom is that the copyist cannot use another's trademark in a manner that would confuse the public as to the copy's source and he cannot make false claims about the similarity or respective quality of the products involved. He must take care to distinguish himself from the trademark owner and his copy from the original. *Monte Carlo Shirt*, 707 F.2d at 1057 n. 3; *Saxony Products, Inc. v. Guerlain, Inc.*, 513 F.2d 716, 722 (9th Cir.1975); *Smith v. Chanel*, 402 F.2d at 565–66.

■ One consequence of the rule announced in *Smith v. Chanel* is that the copyist may freely capitalize on the goodwill and product recognition developed at great cost by the trademark owner. *Monte Carlo Shirt*, 707 F.2d at 1057 n. 3; *Anti-Monopoly*, 611 F.2d at 301 n. 2. The trademark owner has no redress against this activity under either federal trademark or state unfair competition laws. *Smith v. Chanel*, 402 F.2d at 563.

The reasons for this policy, harsh though it may seem on occasion, were aptly stated by the court in *Smith v. Chanel:*

> A large expenditure of money does not in itself create legally protectable rights. Appellees are not entitled to monopolize the public's desire for the unpatented product, even though they themselves created that desire at great effort and expense. As we have noted, the most effective way (and in some cases the only practical way) in which others may compete in satisfying the demand for the product is to produce it and tell the public they have done so, and if they could be barred from this effort appellees would have found a way to acquire a practical monopoly in the unpatented product to which they are not legally entitled.
>
> Disapproval of the copyist's opportunism may be an understandable first reaction, "[b]ut this initial response to the problem has been curbed in deference to the greater public good." *American Safety Table Co. v. Schreiber*, 269 F.2d at 272. By taking his "free ride," the copyist, albeit unintentionally, serves an important public interest offering comparable goods at lower prices. On the other hand, the trademark owner, perhaps equally without design, sacrifices public to personal interests by seeking immunity from the rigors of competition.

402 F.2d at 568–69 (footnote omitted).

These principles make it clear that Sykes cannot proceed on its first or second claims for relief. Plaintiff does not allege that defendants' use of the Sykes name or the Perfect Nail mark is confusing or mislead-

ing.[3] Nor does plaintiff allege that defendants, in calling their product a "version" of Perfect Nail, have falsely represented that their generic nail hardener is similar to plaintiff's.[4] Rather, plaintiff complains only that defendants have misappropriated Sykes' goodwill and thereby preyed upon its hard earned reputation for high quality fingernail conditioners.

■ Plaintiff believes all this to be grossly unjust because Sunshine's lower costs allow it to sell its product at a price far below Sykes'. But what have defendants done other than follow the letter of the law? If they have taken a "free ride" on plaintiff's name without causing confusion or deception, then they have taken that to which they were legally entitled. In this circuit defendants commit no act of unfair competition merely because they refer to plaintiff's nail hardener by its name in order to win over customers interested in a lower cost product. Under *Smith v. Chanel* the "misappropriation of goodwill" does not in and of itself amount to an infringement, and the rationale behind this rule applies regardless of whether the trademark owner's mark is used in comparative advertising, or, as here, in the actual identification of the defendants' product.[5] "[W]hether one is entitled to refer to a competitor's trademark depends not on where the reference appears but on whether the reference is truthful." *G.D. Searle & Co. v. Hudson Pharmaceutical Corp.,* 715 F.2d 837, 843 (3d Cir.1983) (holding that a laxative manufacturer could include a truthful reference in the text of its package to a competitor's equivalent product).

■ Finally, the court must also reject the attempt to characterize defendants' behavior as actionable "misappropriation," as that species of unfair competition is known, under *International News Service v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918). The Court of Appeals already has stated its belief that the state courts would refuse to extend the misappropriation theory to trademark infringement or the "taking" of the goodwill enveloped in a trademark. *Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d 788, 794 (9th Cir.1981).[6] As Professor McCarthy has written:

> If there can be such a thing as "misappropriation" of another's trademark, irrespective of distinctiveness and likelihood of buyer confusion, then a big step has been taken to wipe out the law of trademarks. Thus, it is a misnomer to talk of "misappropriation" of trademarks or trade symbols of any type. The courts have recognized that if plaintiff has failed under classic trademark law to prove trademark ownership and infringement, then plaintiff cannot claim that defendant has "misappropriated" the la-

---

3. Plaintiff could not reasonably support such an allegation, considering the efforts defendants have made to disavow any affiliation with plaintiff.

4. In fact, as noted earlier, the "generic brand" package suggests only that the public *compare* Sunshine's nail hardener with Sykes' and expressly states, "We don't represent that our products are identical in every respect with the name brand company's." Thus despite defendants' use of the term, "version," in referring to their copy of plaintiff's nail hardener, the claimed similarity of the two products is not at issue in this suit. There are consequently no factual disputes over the truth of defendants' representations that would preclude summary judgment. *Cf. Saxony,* 513 F.2d at 722–23 (district court erred in summary judgment proceedings when it conducted "sniff test" to determine whether defendant's Fragrance S was "similar to" the plaintiff's perfume Shalimar, as advertisement in question had claimed).

5. This does not mean, however, that the trademark owner is always without redress. If he can show that this "taking" was accompanied by a diminution in value of the trademark itself, there may be a claim for dilution under state law. See part 2 of this opinion.

6. Indeed, if this court were to prevent defendant from accurately labeling its product because of the purported misappropriation of goodwill in "Sykes' Perfect Nail,'" plaintiff would have found a ready means of circumventing the rule that state unfair competition laws cannot be invoked so as to override the goals of federal patent law. *See Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); *Smith v. Chanel,* 420 F.2d at 568.

bor expended in creating the "trademark."

1 J. McCarthy, *Trademarks and Unfair Competition* § 10:34, at 430 (2d Ed.1984) (footnote omitted).

2. *Defendants' motion for summary judgment on plaintiff's third claim.*

Sykes' third claim for relief is for trademark dilution under section 14330 of the California Business and Professions Code, which provides in relevant part:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark ... shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.

Cal.Bus. & Prof.Code § 14330 (West Supp. 1985). Plaintiff alleges that the unauthorized usage of its name and mark on defendants' rack-type package will likely injure the plaintiff's reputation and dilute its mark under the meaning of this section.

California's anti-dilution statute and its counterparts in other states provide a fallback basis for relief to an aggrieved trademark owner who cannot bring the facts of his situation under the conventional rubrics of infringement or unfair competition. "[W]here the likelihood of confusion test leaves off, the dilution theory begins." 2 J. McCarthy, *supra*, § 24:13, at 213. The doctrine protects "strong, well-recognized marks even in the absence of a likelihood of confusion, if defendant's use is such as to tarnish, degrade or dilute the distinctive quality of the mark." *Toho Co.*, 645 F.2d at 793. "The underlying rationale of the dilution doctrine is that the gradual diminution or whittling away of the value of a trademark, resulting from use by another, constitutes an invasion of the senior user's property right and good will in his mark and gives rise to an independent wrong." 2 J. McCarthy, *supra*, § 24:13, at 213.

Defendants make three arguments in support of their motion for summary judgment on the dilution claim: first, that the dilution statute does not apply where the parties' marks are used on competing rather than unrelated products; second, that the acts with which defendants are charged must be treated like comparative advertising and cannot be said to constitute dilution; and third, that the first amendment protects "informative comparative advertising and labeling" of the sort involved here. After closely considering these arguments, the court concludes that the allegations of this case could support a claim under the anti-dilution statute and that there exist genuine factual issues over the constituent elements of this claim, as outlined below. Therefore, the court orders that summary judgment be denied as to the third claim for relief.

■ The concept of trademark dilution cannot be limited as defendants insist to circumstances involving non-competing and unrelated goods. Granted, the Ninth Circuit has stated that it regards "the anti-dilution doctrine with some concern 'lest it swallow up all competition in the claim of protection against trade name infringement.'" *Toho Co.*, 645 F.2d at 793 (quoting *Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler*, 305 F.Supp. 1210, 1217 n. 13 (N.D.Cal.1969)). Further, the court recognizes that case law suggests the anti-dilution statutes are not primarily addressed to injury caused by competitors. *See Steinway & Sons v. Robert Demars & Friends*, 210 U.S.P.Q. (BNA) 954, 963 (C.D. Cal.1981) ("The evil which the Legislature sought to remedy was not public confusion caused by similar products or services sold by competitors, but a cancer-like growth of dissimilar products or services which feeds upon the business reputation of an established, distinctive trademark or name."); *Pro-phy-lac-tic Brush Co. v. Jordan Marsh Co.*, 165 F.2d 549, 553 (1st Cir.1948) (same); *Aris-Isotoner Gloves, Inc. v. Fownes Brothers & Co., Inc.*, 222 U.S.P.Q. (BNA) 489, 496 (S.D.N.Y.1983) (same).

Nonetheless the court cannot accept the interpretation of Section 14330 urged by defendants. The statute's language, providing an additional ground for relief "*notwithstanding* the absence of competition

between the parties," cannot fairly be read to *preclude* such relief where the parties compete. Indeed, courts have found dilution under section 14330 (and similar statutes elsewhere) in the context of competing goods while also finding a likelihood of confusion of sponsorship. *E.g., Golden Door, Inc. v. Odisho,* 437 F.Supp. 956, 966 (N.D.Cal.1977) (Schwarzer, J.), *aff'd,* 646 F.2d 347 (9th Cir.1980); 2 J. McCarthy, *supra,* § 24:13, at 215 (see cases cited therein); *see* W. Pattishall, *The Dilution Rationale for Trademark—Trade Identity Protection, Its Progress and Prospects,* 67 Trade-Mark Rep. 607, 613 (1977) (criticizing decisions holding that dilution statutes are inoperative where parties' goods compete). As the state courts have not yet had the opportunity to decide the issue, this court declines to graft on to section 14330 a limitation that defies the statute's logical construction.

Since California's anti-dilution statute could apply to competing goods, the court must decide whether the defendants' use of plaintiff's mark in packaging the generic nail hardener could amount to dilution under the statute. The facts of this dispute make it clear that it is not a "typical" dilution case. In the past courts have based liability for dilution on a showing that a party's reference to another's trademark tarnished it or degraded it or associated it with something unsavory. For example, in *Coca-Cola Co. v. Gemini Rising, Inc.,* 346 F.Supp. 1183 (E.D.N.Y.1972), the court, relying in part on New York's anti-dilution statute, issued a preliminary injunction against defendant's sale of "Enjoy Cocaine" posters, which used a script and color similar to Coca Cola's well known mark. *Id.* at 1190–92. Similarly, in *Tiffany & Co. v. Boston Club, Inc.,* 231 F.Supp. 836 (D.Mass.1964), it was held that the Tiffany name and trademark was being diluted by defendant's use of it in connection with an inexpensive restaurant and lounge in Boston. *Id.* at 842–43.

In this case, however, Russ Kalvin's borrowing of the Sykes' trademark does not connote anything unfavorable about plaintiff's product or name. Indeed, as defendants hasten to point out, such a result would be counterproductive to their efforts to foster sales of the generic brand. Defendants' packaging promotes the idea that both nail hardeners are equivalent products, although defendants' generic version costs less.

The dilution doctrine cannot be confined, however, to the situation typified in the *Tiffany* and *Coca-Cola* cases. This case presents a unique situation in which the dilution doctrine offers the only hope for relief to a business whose competitor has adopted its mark in a way that will not confuse the buying public but could theoretically threaten the mark's distinctive quality as a selling device. Defendants here arguably have gone further than the manufacturer Ta'Ron did in *Smith v. Chanel.* Russ Kalvin's attempt to foster good will for his "generic brand" depends entirely on the reputation of plaintiff and others. By using "Sykes' Perfect Nail" as the primary means of identifying their own product, defendants have gone beyond the comparative advertising at issue in *Smith v. Chanel.*

Assuming that plaintiff could fulfill the other requirements for a dilution claim, which are discussed below, the plaintiff may maintain its action for injunctive relief on the theory that Sunshine's unimpaired reference to and identification of its own product as a "version" of plaintiff's may render Sykes' Perfect Nail a generic term. The harm to be prevented is not the misappropriation of good will through a "free ride"; *Smith v. Chanel* permits this. Rather, it is the destruction of good will, or as one writer has put it, the "death" of a trademark. Derenberg, *The Problem of Trademark Dilution and the Antidilution Statutes,* 44 Calif.L.Rev. 439, 463 (1956). *See Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1208 (E.D.N.Y.1983) (holding that distinctiveness and selling power of "Toys R Us" trademark were being diluted by proliferation of other "R" Us names, including defendant's "Kids 'r' Us," making injunctive relief ap-

propriate under New York's anti-dilution statute.)

The court in *Smith v. Chanel* clearly considered the potential application of dilution in such circumstances, declining to apply it only because of the facts of that case:

The second major argument for extended trademark protection is that even in the absence of confusion as to source, use of the trademark of another "creates a serious threat to the uniqueness and distinctiveness" of the trademark, and "if continued would create a risk of making a generic or descriptive term of the words" of which the trademark is composed.

The contention has little weight in the context of this case. Appellants do not use appellees' trademark as a generic term. They employ it only to describe appellees' product, not to identify their own. They do not label their product "Ta'Ron's Chanel No. 5," as they might if appellees' trademark had come to be the common name for the product to which it is applied. Appellants' use does not challenge the distinctiveness of appellees' trademark, or appellees' exclusive right to employ that trademark to indicate source or sponsorship. For reasons already discussed, we think appellees are entitled to no more. The slight tendency to carry the mark into the common language which even this use may have is outweighed by the substantial value of such use in maintenance of effective competition.

402 F.2d at 569.

Moreover, application of dilution in this context also has been endorsed by leading trademark authorities as well as other commentators. For example, Dr. Callmann's treatise states:

Such terms as "substitute for," "made like," "similar to" or "as good as" another's trademarked article, though they would appear to be innoculously descriptive, are normally disingenuously aimed at capitalizing upon the selling power of another's mark. It should be noted, at the outset, that if competitors can freely misuse a more famous mark, the trademark owner would be powerless to prevent it from becoming generic. Accordingly, any such trademark usage by competitors must be viewed with suspicion because it necessarily involves the inherent risk of dilution.

3A R. Callmann, *The Law of Unfair Competition, Trademarks, and Monopolies*, § 21.22, at 21–95 (L. Altman 4th ed. 1983) (footnotes omitted). *See* 2 J. McCarthy, *supra*, § 24:13, at 223; Derenberg, *supra*, 44 Calif.L.Rev. at 441, 463; Note, *Antidilution Statutes: A New Attack on Comparative Advertising*, 61 B.U.L.Rev. 220, 226 (1981); Note, *Dilution: Trademark Infringement or Will-O'-the-Wisp?*, 77 Harv.L.Rev. 520, 523 (1964).

■ In order to prevail on the dilution claim and obtain injunctive relief, plaintiff would have to prove at trial that:

1. Plaintiff's trademark, "Sykes' Perfect Nail," has achieved sufficient secondary meaning to qualify as a strong, well-recognized mark. *See Toho Co.*, 645 F.2d at 793; *Olay Company, Inc. v. Cococare Products, Inc.*, 218 U.S.P.Q. (BNA) 1028, 1044 (S.D.N.Y.1983). The dilution doctrine is only available to protect distinctive marks as exemplified by such famous names as "Tiffany," "Polaroid," "Rolls Royce" and "Kodak." *See* 2 J. McCarthy, *supra*, § 24:14, at 224–25. ("To save the dilution doctrine from abuse by plaintiffs whose marks are not famous and distinctive, a large neon sign should be placed adjacent wherever the doctrine resides, reading: 'The Dilution Rule: Only Strong Marks Need Apply.' ");

2. Defendants do not employ the trademark to describe the goods they are copying but rather to identify their own nail hardener. *See Smith v. Chanel*, 402 F.2d at 569; and

3. Defendants' usage is likely to dilute the distinctive quality of plaintiff's mark by turning "Sykes' Perfect Nail" into a generic term. *Id.*

■ Lastly, the court notes that the first amendment poses no obstacle to the

maintenance of a dilution claim where a plaintiff can meet the stringent standards just delineated. Although defendants' packaging of their brand involves "commercial speech" to the extent it imparts information about defendant's product, *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980), this fact alone does not immunize defendants' conduct from regulation. The state can restrict commercial expression if there is a substantial governmental interest in doing so and if the means chosen are no broader than necessary to serve that interest. *Id.* at 565–66, 100 S.Ct. at 2350–51.

The Constitution would not be offended by applying the dilution doctrine in the very limited fashion envisioned here. The state has a strong interest in protecting distinctive trademarks from harmful uses by business competitors, even in the absence of confusion. "[D]ilution is an infection which, if allowed to spread, will inevitably destroy the advertising value of the mark." *Mortellito v. Nina of California, Inc.*, 335 F.Supp. 1288, 1296 (S.D.N.Y. 1972). The anti-dilution statute in no way restricts the right to advertise a claim that one's product is as good as a better known brand but one may not do it in a way that risks turning the latter into a generic term. *Cf. Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206 (2d Cir.1979) (trademark right need not yield to exercise of first amendment privilege where adequate alternative means exist to communicate defendant's message). If injunctive relief were not available to prevent dilution of a trademark, "then any unauthorized reproduction of a trade name or mark would be without remedy." *Coca-Cola Co.*, 346 F.Supp. at 1193.

*3. Defendants' motion for summary judgment on plaintiff's fourth and fifth claims for relief and defendants' request for an order cancelling trademark registration.*

Plaintiff's fourth and fifth claims allege infringement and unfair competition by virtue of defendant's use of a bottle identical to plaintiff's in marketing its competing nail hardener. Sykes bottle is a ¼-oz. relatively-flat, banjo-shaped container for which plaintiff obtained trademark registration no. 1,277,707, effective May 15, 1984, for use in storing nail polish conditioner. The thrust of both these claims is that defendants' imitation of plaintiff's bottle has created a likelihood of confusion among consumers such that they will buy the "generic brand" thinking it either is Sykes' product or is sponsored by Sykes.

Defendants move for summary judgment on these claims, arguing that plaintiff's bottle design cannot validly function as a trademark and that defendants' trade dress could not cause the necessary likelihood of confusion. Defendants also request that plaintiff's trademark registration be cancelled under 15 U.S.C. § 1119 (1982),[7] on the grounds that the registration was fraudulently obtained and that the bottle design is either a generic mark as to cosmetic goods or a merely descriptive mark lacking secondary meaning, either of which would render the design unregistrable under the Lanham Act. *See* 15 U.S.C. §§ 1052(e), 1064(c) (1982).

As "likelihood of confusion" is the heart of any trademark infringement or unfair competition action, the court shall address this question first. "Likelihood of confusion" exists if consumers would probably be confused about the source, affiliation, or sponsorship of defendant's goods as the result of its adoption of plaintiff's mark. *Lindy Pen Co., Inc. v. Bic Pen*

---

**7.** 15 U.S.C. § 1119 (1982) provides:

Power of court over registration

In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Commissioner, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

*Id.*

*Corp.*, 725 F.2d 1240, 1243, 1246 (9th Cir. 1984); 2 J. McCarthy, *supra*, § 23:1, at 47. The category of buyer protected by trademark law against this confusion includes not only the careful or discriminating buyer but also the ignorant, the inexperienced, and the gullible. *Stork Restaurant v. Sahati*, 166 F.2d 348, 359 (9th Cir.1948).

▮▮▮▮▮ In this circuit a determination of likelihood of confusion is

> a conclusion of law premised on an analysis of a number of subsidiary factors, including the strength of plaintiff's mark, the similarity of the marks, the similarity of plaintiff's and defendant's goods and the proximity of their marketing channels, evidence of actual confusion, defendant's intent in selecting the mark, the type of goods and the degree of care exercised by purchasers.

*Lindy Pen Co.*, 725 F.2d at 1243. Where these factors (or "foundational facts" as they otherwise are known) can be discerned from uncontested evidence presented through affidavits and exhibits, the court can determine likelihood of confusion as a matter of law without need for trial. *See J.B. Williams Co. v. Le Conte Cosmetics, Inc.*, 523 F.2d 187, 191 (9th Cir.1975) (appellate court would decide likelihood of confusion for itself where trial court's finding was based on uncontroverted factual record), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976). Despite a decided judicial preference not to dispose of trademark disputes through Rule 56 proceedings, summary judgment should be granted where the party opposing the motion fails to demonstrate the existence of any material issues of fact for trial. *United States Jaycees v. San Francisco Jr. Chamber of Commerce*, 354 F.Supp. 61, 68–69, 78 (N.D.Cal.1972) (Renfrew, J.), *aff'd*, 513 F.2d 1226 (9th Cir.1975); *Pure Gold, Inc. v. Syntex 9 (U.S.A.), Inc.*, 739 F.2d 624, 626–27 (Fed.Cir.1984).

▮▮▮ In making the legal determination regarding confusion, the court must evaluate the marks not in the abstract but rather "in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase" of the products involved. *Lindy Pen Co.*, 725 F.2d at 1245; *see Air Pirates, supra*, 581 F.2d at 759 (holding that trial court should go beyond simple side-by-side comparison of marks in question). In the usual case this means focusing on the point of sale of the allegedly infringing item, *see BRS, Inc. v. Volume Shoe Corp.*, 218 U.S. P.Q. (BNA) 604, 608 (N.D.Ga.1982), as the confusion with which trademark law is primarily concerned would typically arise at this moment.[8] At the same time, however, the court must also pay heed to the potential for confusion among *prospective* purchasers. This means viewing the goods as they would appear in everyday use, outside the environment of the retail store, and unaccompanied by clarifying promotional materials. *Lindy Pen Co.*, 725 F.2d at 1245–6; *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir.1980); *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir.1983).

▮▮▮▮ The facts of this case make it an appropriate one for summary judgment. Sunshine does not deny that its bottle conformation is identical to plaintiff's, that the "generic brand" competes directly for sales with "Perfect Nail," or that both products reach the public through the same marketing channels (beauty supply stores). Moreover, the court is prepared to assume for the purposes of this motion that a person purchasing a bottle of nail hardener would not exercise a high degree of care. But all of this is of little significance here in view of the uncontested evidence showing that defendants have never used their bottle either in selling or in advertising their copy of plaintiff's product. Quite to the contrary, defendants' container is enclosed in a sealed package which itself bears a conspic-

---

**8.** "[I]n cases of trade-mark infringement and unfair competition, the wrong takes place ... where the passing off occurs, i.e., where the deceived customer buys the defendant's product in the belief that he is buying the plaintiff's." *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 639 (2d Cir.), *cert. denied*, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956) (footnote omitted).

uous disclaimer of affiliation, and all defendants' sales materials promote the generic brand by the package alone. A consumer would not even encounter Sunshine's bottle until after purchase. In the case of a prospective purchaser who stumbled across the defendants' product outside the store, he would not see only the bottle, standing alone. Rather, even if the outside package had been discarded, he would also observe the label affixed to the bottle clearly identifying the contents as the "GENERIC BRAND Version of Sykes' Perfect Nail."

As a matter of law, and of common sense, the use of this bottle could not cause a likelihood of confusion either at the critical point of sale or afterwards. Thus it is not surprising that plaintiff failed to present any competent evidence of actual confusion. In fact, all the evidence submitted on this point supports the opposite conclusion.[9]

A more fundamental obstacle to these claims lies in Sykes' utter failure to show that the naked bottle shape it seeks to protect has achieved any trademark significance at all. The bare design of a bottle is almost never an inherently distinctive symbol; rarely can it alone indicate that the product it contains comes from a particular source. See In Re DC Comics, Inc., 689 F.2d 1042, 1050–51 (C.C.P.A.1982) (Nies, J., concurring); Application of McIlhenny Company, 278 F.2d 953, 955 (C.C.P.A. 1960). Rather, non-distinct shapes such as plaintiff's bottle can serve as valid trademarks only when they have achieved that degree of consumer recognition known as "secondary meaning." See American Scientific Chemical, Inc. v. American Hospital Supply Corp., 690 F.2d 791, 792 (9th Cir. 1982) (trade name that was not inherently distinctive would be protectible if it acquired secondary meaning).

Plaintiff effectively conceded that its bottle was not inherently distinctive in the course of registering its design with the Patent and Trademark Office. In response to plaintiff's original application, the Patent and Trademark Office examiner had refused registration on the ground that the nature of the mark was such that plaintiff's claims to exclusive use could not be taken as proof of distinctiveness. Rather than appeal this finding, e.g., In re Hoffman House Sauce Company, 137 U.S.P.Q. (BNA) 486 (1963), plaintiff resubmitted its application with purported evidence of secondary meaning, including the figures and assertions of Mrs. Sykes concerning the sales and advertisement of the bottle shape. Plaintiff's claim that its bottle design had acquired distinctiveness constitutes an admission that the design is otherwise merely descriptive of its goods. Conde Nast Publications, Inc. v. Redwood Publishing Company, 217 U.S.P.Q. (BNA) 356, 357 (T.T.A.B.1983); McIlhenny Co., 278 F.2d at 957.

The critical question, then, is whether plaintiff succeeded in creating secondary meaning for its vial under section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f) (1982). Application of Mogen David Wine Corp., 372 F.2d 539, 540 (C.C.P.A.1967). "The

---

**9.** Plaintiff's evidence of confusion consists of hearsay testimony from the depositions of its present and past distributors, Ray L. Gerber, Donald L. Cottam, and Arthur Marshall. According to Mr. Gerber, an unnamed customer dealing in beauty supplies told him someone was selling a generic Perfect Nail. But, he adds, "She said ... she wouldn't buy it because she was loyal to me and Perfect Nail." Mr. Cottam testified that a rumor was afloat that he no longer distributed Perfect Nail and that there was "confusion" about the possible loss of his distributorship. He could not say, however, whether the Generic Brand's presence on the market was the cause of this "confusion." Finally, Mr. Marshall stated that in his opinion a

person could pick up defendant's identically-shaped bottle and "think it's Perfect Nail," assuming (as is contrary to fact) that the bottle had no identifying information on it. But he goes on to state that if someone were to buy defendant's product, it would be because the ingredients were identical.

Rumors and speculation of this sort hardly qualify as evidence of instances of actual confusion. Alpha Industries v. Alpha Steel Tube & Shapes, Inc., 616 F.2d 440, 444–45 (9th Cir. 1980). This is especially true as plaintiff's exclusive distributor for southern California, where the majority of the generic brand sales occur, testified he had heard of no confusion.

test of secondary meaning is the effectiveness of the effort to create it, and the chief inquiry is directed toward the consumer's attitude about the mark in question: does it denote to him 'a single thing coming from a single source?'" *Carter-Wallace, Inc. v. Proctor & Gamble Co.,* 434 F.2d 794, 802 (9th Cir.1970) (quoting *Aloe Creme Laboratories, Inc. v. Milsan, Inc.,* 423 F.2d 845, 849–50 (5th Cir.), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970)). In the case of a non-distinctive bottle, plaintiff must show that it "'creates a commercial impression separate and apart from the word marks appearing thereon and serves, in and of itself, as an indication of origin' for [plaintiff's] product in the bottle." 1 J. McCarthy, *supra,* § 7:31, at 265–66, (quoting *Mogen David Wine Corp.,* 372 F.2d at 542).

■ In attempting to show secondary meaning plaintiff points out that under section 7(b) of the Lanham Act a certificate of registration constitutes *prima facie* evidence of the validity of the trademark and of the registrant's exclusive right to use it in commerce in connection with the goods specified in the certificate. 15 U.S.C. § 1057(b) (1982). But this statutory presumption merely puts the burden of proof on the party challenging the validity of the registered mark. *Dymo Industries, Inc. v. Tapeprinter, Inc.,* 326 F.2d 141, 143 (9th Cir.1964). Section 7(b) does not relieve a trademark registrant of the necessity of showing that a genuine issue for trial exists over the validity of its mark, when as here a motion for summary judgment has been made. Fed.R.Civ.P. 56(e); *see United States Jaycees,* 354 F.Supp. at 69 (summary judgment appropriate in dispute over registered mark where no genuine issues for trial existed).

■ The affidavits and exhibits submitted in opposition to this motion simply do not show the existence of any such issue. A substantial portion of plaintiff's evidence dealt with Mrs. Sykes' efforts to procure the design and production of the one-quarter ounce bottle from the manufacturer W. Braun Company and to protect the molds from use by competitors. These efforts, however, do not amount to proof that the custom-designed bottle ever achieved secondary meaning. *Mark Charcoal Co., Inc. v. Almarc Manufacturing, Inc.,* 215 U.S.P.Q. (BNA) 1076, 1077 (N.D. Ill.1981). Nor is plaintiff's position advanced by the opinions of Mrs. Sykes or her distributors that the bottle design is "unique"; this does not show that consumers actually associate the bottle with the product. "[A] mere intent will not convert a non-distinctive bottle into a trademark." *Hoffman House,* 137 U.S.P.Q. at 487.

All the evidence supports defendants' position that the plaintiff's bottle design does not create a distinct commercial impression calling to mind Sykes Laboratory. It is undisputed that Sykes has never promoted its design separate and apart from the trademark name, "Sykes' Perfect Nail." *See Mogen David Wine Corporation,* 372 F.2d at 541–42 (decanter bottle did not function as trademark where there had been no promotion of container configuration apart from name of wine product). Plaintiff's exhibits do not show that the container even possesses any distinctive feature that could be promoted as identifying the nail hardener. *See McIlhenny Co.,* 278 F.2d at 956 (upholding refusal to register as mark for pepper sauce a small, plain bottle with no features particularly connecting it to the sauce); *cf. Ex parte Haig & Haig Ltd.,* 118 U.S.P.Q. (BNA) 229, 230 (Dec.Comm'r Pat.1958) (granting registration for well known "pinch bottle" as container for Scotch whiskey). In fact the letters of praise from satisfied customers reveal that they refer to plaintiff's product by its tradename and not by its container shape. Finally, plaintiff has not controverted defendants' showing that more than 130 other distributors of cosmetics, including nail care products, have used and advertised the very same bottle. The conclusion is inescapable that whatever secondary meaning plaintiff has achieved relates primarily to the tradename "Sykes' Perfect Nail" and not its bottle design.

The court finds that defendants are entitled to summary judgment on the fourth and fifth claims for relief since plaintiff has failed to demonstrate the existence of any material issues of fact with regard to either likelihood of confusion or secondary meaning.

■ The court's conclusion that Sykes' bottle configuration lacks any trademark significance because it never acquired secondary meaning makes it easy to dispose of defendants' request that the registration be cancelled. The Lanham Act, 15 U.S.C. § 1119, vests this court with the power to order cancellation in any action involving a registered mark.[10] If there exist no genuine issues of material fact over the invalidity of a registered mark, then an order cancelling the mark's registration may be issued on a motion for summary judgment. *E.g., Nestle Co. v. Chester's Market, Inc.,* 571 F.Supp. 763, 779–80 (D.Conn.1983), *rev'd on other grounds,* 756 F.2d 280 (2d Cir.1985).

■ In the case of a trademark such as Sykes' that has been on the principal register for less than five years, cancellation may be effected on any ground upon which registration could have been denied initially. *International Order of Job's Daughters v. Lindeburg & Co.,* 727 F.2d 1087, 1091 (Fed.Cir.1984). A mark that is merely descriptive and lacks secondary meaning is unregistrable and hence may be cancelled. 15 U.S.C. § 1052(e) (1982). *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* —— U.S. ——, ——, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985); *see, e.g., American Heritage Life Insurance Co. v. Heritage Life Insurance Co.,* 494 F.2d 3, 13–14 (5th Cir.1974) (reversing district court for refusing to order cancellation of mark that was merely descriptive and lacked secondary meaning);

*Bascom Launder Corp. v. Telecoin Corp.,* 204 F.2d 331, 335–36 (2d Cir.) (same), *cert. denied,* 345 U.S. 994, 73 S.Ct. 1133, 97 L.Ed. 1401 (1953). "[W]hen a court determines that a mark is either a generic term or a descriptive term lacking secondary meaning, the purposes of the Lanham Act are well served by an order cancelling the mark's registration." *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 792 (5th Cir.1983).

■ In light of the finding that Sykes' bottle design is a descriptive mark lacking secondary meaning, the court orders that Trademark Registration No. 1,277,707 for "base coat and conditioner for fingernails" and "nail polish drying preparation" be cancelled.[11]

---

**10.** Defendants did not file any counterclaim in support of their request that plaintiff's registration be cancelled. The existence of such an independent claim for relief would not, however, appear to be a prerequisite to an order cancelling a registration under section 1119. The court's powers under this section to "rectify the register" may be invoked whenever the validity of a registered mark is properly put in issue, as was the case here through defendants'

affirmative defenses. *See Dymo Industries,* 326 F.2d at 143.

**11.** It is, therefore, unnecessary to consider whether plaintiff's mark should be cancelled, as defendants contend, on the additional grounds that the registration was fraudulently obtained or that the design is a generic mark.