**TIFFANY & BROADWAY, INC., Plaintiff,**

v.

**COMMISSIONER OF PATENTS AND TRADEMARKS, Defendant.**

No. CIV. A. H–99–179.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 30, 2001.

Alton W. Payne, Jr., Houston, TX, for Plaintiff.

John B. Kinchen, Vernon L. Lewis, Assistant U.S. Attorneys, Houston, TX, for Defendant.

Opinion on Summary Judgment

HUGHES, District Judge.

1. *Introduction.*

Tiffany & Broadway, Inc., seeks judicial review of the appeal board's decision affirming the patent office's denial of its application to register "Tiffany" for ladies' dress shoes. The office refused because of its confusing similarity to four registrations by Tiffany & Company of New York. "Tiffany" is likely to cause confusion with Tiffany & Company's marks. The decision stands.

2. *Background.*

Tiffany & Broadway, a Texas corporation, began in 1990 wholesaling inexpensive ladies' dress shoes, including ones called "Tiffany," in Eastern and Middle Europe. The shoes have been sold in the Czeck Republic, Poland, Lithuania, the Ukraine, and the Slovak Republic. The shoes are priced between ten and thirty American dollars.

Tiffany & Company, a New York corporation, was organized in 1868 as a successor to a business founded in 1837 by Charles Lewis Tiffany and John Young. Tiffany has sold a variety of goods, including jewelry, china, silverware, glassware, leather goods, belt buckles, ties, scarves, clocks, watches, brushes, and lamps. It registered "Tiffany" and "Tiffany & Co." in 1893 and owns approximately 48 registrations for them. It has continuously sold merchandise bearing those names at over 60 Tiffany locations worldwide—including 34 in the United States—and through in-

dependently–owned retail stores and mail-order.

### 3. *Application.*

Tiffany & Broadway decided to expand to the United States in 1995. Hoping to sell its shoes in American outlets and department stores, it filed intent-to-use applications for "Tiffany," "Tiffany & Broadway," and "Lady Tiffany" in the United States. Although its other two applications remain pending, its application to use "Tiffany" was refused. The office decided that it too closely resembled four of Tiffany & Company's registrations for "Tiffany" and "Tiffany & Co." goods, including belts and men's ties.

### 4. *Appeal.*

Tiffany & Broadway appealed. The appeal board affirmed the decision. The company then sued the commissioner of patents, asking the court to reverse the board's decision, obliging the commissioner to register its mark.

Both parties moved for summary judgment on the likelihood of consumers confusing Tiffany & Broadway's mark with Tiffany & Company's four marks.

### 5. *Law.*

The law prohibits use of a mark similar to a registered one that "is likely to cause confusion, or to cause mistake, or to deceive" consumers about the good's affiliation. Lanham Trade–Mark Act, 15 U.S.C. § 1114(1)(a). Liability is predicated on use of a trademark in a way that confuses the consumer; this is the focus of the analysis.

■ Likelihood of confusion is determined by evaluating the variety of factors that would reasonably affect the probability of consumer confusion from the use of the competing mark. These include:

- Mark type;
- Mark similarity;
- Product similarity;
- Outlet and purchaser identity;
- Advertising media identity;

Plus:

- Defendant's intent; and
- Actual confusion.

*Roto–Rooter Corp. v. O'Neal*, 513 F.2d 44, 45 (5th Cir.1975).

### A. *Type.*

■ The first factor to consider is whether Tiffany & Company's marks are strong or weak. Strong marks are distinctive with no natural content and unlikely to be used by other people. *Exxon Corp. v. Texas Motor Exchange of Houston*, 628 F.2d 500, 504 (5th Cir.1980). Tiffany & Broadway argues that "Tiffany" and "Tiffany & Co." are not strong because other people often use "Tiffany" for goods—lamps, plates, vases, and windows—and services—taxicabs, photography studios, and flower shops. With the patent office's approval, "Tiffany" has been used to sell paper napkins, toilet paper, and mattresses.

The commissioner maintains that Tiffany & Company's marks are strong because only Tiffany & Company has registered "Tiffany" for a wide variety of goods. It has successfully defended its marks against use on bowling balls, ceiling tiles, ceramic tiles, rare coins, perfume, restaurant services, and automobiles.

Because Tiffany has many uses does not make it weak. Tiffany has no content. It is almost as arbitrary as Kodak or Exxon, being wholly constructed for their trade name purpose. Northwest Van Lines, for example, would be a strong mark within transportation even though there are many uses for "northwest" because of its meaning. Hughes is a common surname among Americans. It is the name of towns and roads. In aircraft and oil tools, though, it

has a special significance. So too with Tiffany & Company, and that leads to fame itself.

### B. Fame.

■ There is no question that Tiffany & Company is famous. *See, e.g., Sykes Laboratory, Inc. v. Kalvin,* 610 F.Supp. 849, 858 (C.D.Cal.1985) ("[t]he dilution doctrine is available to protect distinctive marks as exemplified by such famous names as 'Tiffany,' 'Polaroid,' 'Rolls Royce,' and 'Kodak.'" Tiffany, Rolls, and Royce were surnames, and Polaroid and Kodak were neologisms.) The office included eighteen news articles where Tiffany & Company was identified as a famous business.

The appeal board found that Tiffany & Company's fame increased the likelihood of confusion. *Tiffany & Broadway, Inc.,* Ser. No. 74/670/640, slip op. at 7–8 (TTAB Nov. 16, 1998). Over the years, it has built a high degree of consumer recognition and belief in the quality of its merchandise. "Tiffany" and "Tiffany & Co." have acquired a distinct secondary meaning for consumers for quality craftsmanship, integrity, and reliability. *See, e.g., Tiffany & Co. v. Tiffany Productions, Inc.,* 147 Misc. 679, 264 N.Y.S. 459, 460 (N.Y.Sup.Ct.1932). Consumers who see Tiffany & Broadway's shoes are likely to assume that there is a connection between the shoes and Tiffany & Company and transfer the jeweler's reputation for quality to the shoes or, in reverse, associate the cheap shoes with aqua boxes.

Even if the consumer thinks of Tiffany & Company primarily as a jeweler, its name has valuable economic utility for associated items sold under its common name. The Eddie Bauer Ford Explorer is an example. Eddie Bauer built its name by focusing on clothes and supplies for the outdoors; however, its good reputation in outfitting translates well to sports utility vehicles. Because of these perceived qualities, a consumer may be willing to pay more for a sports utility vehicle bearing Eddie Bauer's name.

### C. Mark Similarity.

The second factor to consider is the overall impression created by the marks. This "[s]imilarity between marks is really nothing more than a subjective 'eyeball' test." 2 J. McCarthy, Trademarks and Unfair Competition § 237:7 at 63 (1973). The marks here are very similar. Tiffany & Broadway admitted that its mark is similar "in sound, appearance, meaning, and connotation" to Tiffany & Company's. The appeal board found that they were essentially identical. *Tiffany & Broadway, Inc.* at 3.

### D. Product Similarity.

■ The appeal board found that Tiffany & Broadway's ladies' dress shoes were closely related to Tiffany & Company's belts and men's ties. *Tiffany & Broadway, Inc.* at 6. Tiffany & Broadway says its shoes are not similar to Tiffany & Company's merchandise, including its belts and men's ties. The commissioner argues that the products are similar because shoes are often advertised and sold near clothing accessories, like belts and men's ties. The office included pages from four catalogs where belts were advertised on the same pages as shoes, and thirty-five trademark registrations for both shoes and belts or ties. Because shoes and accessories are often advertised and sold together, perhaps suggesting to consumers that they come from a single source, the products are similar.

### E. Outlets and Purchasers.

■ The board found that the retail outlets and purchasers for Tiffany & Broadway's shoes and Tiffany & Company's accessories overlap. *Tiffany & Broadway,*

*Inc.* at 7. Although Tiffany & Broadway maintains that its inexpensive shoes will be sold in different stores in different shopping centers than Tiffany & Company's merchandise, both companies sell their goods in outlets and malls. While malls have a variety of stores, from expensive to cheap, stores that sell shoes are likely to sell belts, ties, and—in large department stores—jewelry.

### F. *Advertising.*

Tiffany & Company advertises in catalogues, newspapers, magazines, and on the internet. Because Tiffany & Broadway has never advertised or sold its shoes in the United States, there are no media to compare. It merely asserts that it will not advertise in the same media.

### G. *Intent.*

■ Although Tiffany & Broadway says that it did not intend to pass off its shoes as Tiffany & Company's or profit from its name, it had no evidence of independent sources. Even if the owner had been named Tiffany, the company had a duty to name and style its product to avoid consumers confusion with the senior user's goods. *In re Shell Oil Co.*, 992 F.2d 1204, 1209 (Fed.Cir.1993). Nothing records Tiffany & Broadway's intentions in selecting the mark "Tiffany" or even its company name "Tiffany & Broadway;" however, the words "Tiffany" and "Broadway" have long been connected to Tiffany & Company. Tiffany and Young first opened their store on Broadway in 1837, moving uptown on Broadway in 1847 and 1854. It *was* Tiffany's on Broadway.

Both "Tiffany" and "Broadway" have a cultural flavor to them in the American and foreign market. Since its Broadway beginnings, Tiffany & Company has used fine craftsmanship, symbolized by its distinctive blue boxes, to "evoke images of elegance and exclusivity." *Tiffany & Co. Hist. & T.,* at http://www.tiffany.com/html/time_1837_1850.asp. Broadway is famous for its stores and for its theaters—but both generate glamour. The only conclusion that is reasonable—in the absence of distinct motivation—is that Tiffany & Broadway selected these two names to garner glamour unavailable with, say, Van Buren & New Jersey Turnpike. *See, e.g., Tiffany & Co. v. Tiffany Productions, Inc.,* at 461, *citing John Forsythe Co. v. Forsythe Shoe Corp.,* 234 App. Div. 355, 358, 254 N.Y.S. 584, 587 ("Almost invariably the selection ... of a trade name or mark which has ... been used and advertised by another, is for the purpose of appropriating its value and reaping the benefit of the labor of him who may have made that name an emblem of quality, or of taste, or a symbol of fair dealing.").

### H. *Actual Confusion.*

■ Although proof of actual confusion is not required, logically evidence of it is the strongest support for establishing the likelihood of confusion. Lanham Trade–Mark Act, § 32(1), 15 U.S.C.A. § 1114(1). Moreover, "while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir.1971).

The parties jointly developed a consumer survey to gather data about actual confusion. They selected Dr. Edward Blair, professor and chairman of the University of Houston's marketing and entrepreneurship department, as their expert. Doctor Blair designed the survey and gathered 410 responses in September and October 2000 at shopping malls in Seattle, Omaha, Boston, and Miami. Those surveyed were women ages eighteen to sixty-four who had shopped for ladies' dress shoes in the past twelve months. They were individu-

ally shown a pair of dress shoes with "Tiffany" on the inner sole, asked what they thought about them, and then asked a series of questions.

Doctor Blair's questions measured confusion through spontaneous references to Tiffany & Company; they mentioned sourcing—who puts out the shoe, with whom there might be a licensing arrangement or other affiliation, and from whom there might be approval—and speculated on the existence of a relationship between the two companies. The parties approved the questions. The surveyors examined the proper universe—women who shop for ladies' dress shoes—in the proper setting, shopping malls in four representative cities. Two of the cities selected, Boston and Seattle, have Tiffany & Company stores. All four cities have Payless ShoeSource stores, identified by Tiffany & Broadway as a probable suitable vendor for it. Thus, the survey results are cogent. *See Exxon v. Texas Motor Exchange* at 506-7.

■ The results indicate a likelihood of confusion between Tiffany & Broadway's shoes and Tiffany & Company merchandise. Approximately 15 percent of those surveyed said the shoe was put out by, affiliated with, or approved by Tiffany and that Tiffany also sells jewelry, purses, handbags, or perfume. Twenty-six percent answered affirmatively when asked if they thought the shoe had some relationship with Tiffany the jeweler. *See, e.g., id. at* 507 (finding strong evidence of likelihood of confusion in survey showing a 15 percent association rate between Texon sign and EXXON); *see also Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway & Sons,* 365 F.Supp. 707, 716 (S.D.N.Y.1973) (finding strong evidence of likelihood of confusion between Steinway and Grotrian–Steinweg where 7.7% perceived a business connection between the two companies and 8.5% confused the names). Of those surveyed who did *not*

think that there was a relationship, 18.5 percent said that the shoe was not Tiffany quality or mentioned Tiffany quality. These consumers made the connection that presumably Tiffany & Broadway wanted them to make—expensive, well-done products—but saw through it.

*7. Conclusion.*

The usual factors strongly support a finding of likelihood of confusion; that means the commissioner's decision was supported by substantial evidence. In this court's evaluation, the evidence is preponderant. The commissioner's motion for summary judgment will be granted. Tiffany & Broadway's motion will be denied. Tiffany & Broadway will take nothing. The denial subsists.