R. G. SMITH, doing business under the name and style of Ta'Ron, Inc., and International Fragrances, Inc., Appellants,

v.

CHANEL, INC., and Chanel Industries, Inc., Appellees.

No. 21522.

United States Court of Appeals
Ninth Circuit.

Oct. 21, 1968.

Rehearing Denied Nov. 15, 1968.

Carl Hoppe (argued) and Ernest M. Anderson, of Eckhoff & Hoppe, San Francisco, Cal., for appellants.

Dirks B. Foster (argued) of Boyken, Mohler, Foster & Schlemmer, Robert E. Zang and Brian Fogarty, San Francisco, Cal., Landels, Ripley, Gregory & Diamond (A. C.), San Francisco, Cal., Alfred T. Lee, New York City, (argued) (A.C.), for appellees.

Before HAMLIN, BROWNING and DUNIWAY, Circuit Judges.

BROWNING, Circuit Judge:

* Appellant R. G. Smith, doing business as Ta'Ron, Inc., advertised a fragrance called "Second Chance" as a duplicate of appellees' "Chanel No. 5," at a fraction

of the latter's price.[1] Appellees were granted a preliminary injunction prohibiting any reference to Chanel No. 5 in the promotion or sale of appellants' product.[2] This appeal followed.

The action rests upon a single advertisement published in "Specialty Salesmen," a trade journal directed to wholesale purchasers. The advertisement offered "The Ta'Ron Line of Perfumes" for sale. It gave the seller's address as "Ta'Ron Inc., 26 Harbor Cove, Mill Valley, Calif." It stated that the Ta'Ron perfumes "duplicate 100% perfect the exact scent of the world's finest and most expensive perfumes and colognes at prices that will zoom sales to volumes you have never before experienced!" It repeated the claim of exact duplication in a variety of forms.

The advertisement suggested that a "Blindfold Test" be used "on skeptical prospects," challenging them to detect any difference between a well known fragrance and the Ta'Ron "duplicate." One suggested challenge was, "We dare you to try to detect any difference between Chanel #5 (25.00) and Ta'Ron's 2nd Chance. $7.00."

In an order blank printed as part of the advertisement each Ta'Ron fragrance was listed with the name of the well known fragrance which it purportedly duplicated immediately beneath. Below "Second Chance" appeared "*(Chanel #5)." The asterisk referred to a statement at the bottom of the form reading "Registered Trade Name of Original Fragrance House."

Appellees conceded below and concede here that appellants "have the right to copy, if they can, the unpatented formula of appellees' products."[3] Moreover, for the purposes of these proceedings, appellees assume that "the products manufactured and advertised by [appellants] are *in fact* equivalents of those products manufactured by appellees." (Emphasis in original.) Finally, appellees disclaim any contention that the packaging or labeling of appellants' "Second Chance" is misleading or confusing.[4]

I

The principal question presented on this record is whether one who has copied an unpatented product sold under a trademark may use the trademark in his advertising to identify the product he has copied. We hold that he may, and that such advertising may not be enjoined under either the Lanham Act, 15 U.S.C. § 1125(a) (1964), or the common law of unfair competition, so long as it does not contain misrepresentations or create a reasonable likelihood that purchasers will be confused as to the source, identity, or sponsorship of the advertiser's product.

This conclusion is supported by direct holdings in Saxlehner v. Wagner, 216 U.S. 375, 30 S.Ct. 298, 54 L.Ed. 525 (1910); Viavi Co. v. Vimedia Co., 245 F. 289 (8th Cir. 1917), and Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dept. Stores, Inc., 299 F.2d 33, 1 A.L.R.3d 752 (2d Cir. 1962).

In *Saxlehner* the copied product was a "bitter water" drawn from certain privately owned natural springs. The plaintiff sold the natural water under

---

1. The Ta'Ron products were packaged and sold to appellant Smith by appellant International Fragrances, Inc.

2. Chanel, Inc. v. Smith, 151 U.S.P.Q. 685 (N.D.Cal.1966).

3. Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 231–233, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 237–238, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

4. Appellants' product was packaged differently from appellees', and the only words appearing on the outside of appellants' packages were "Second Chance Perfume by Ta'Ron." The same words appeared on the front of appellants' bottles; the words "Ta'Ron trademark by International Fragrances, Inc., of Dallas and New York" appeared on the back.

the name "Hunyadi Janos," a valid trademark.[5] The defendant was enjoined from using plaintiff's trademark to designate defendant's "artificial" water, but was permitted to use it to identify plaintiff's natural water as the product which defendant was copying.

Justice Holmes wrote:

We see no reason for disturbing the finding of the courts below that there was no unfair competition and no fraud. The real intent of the plaintiff's bill, it seems to us, is to extend the monopoly of such trademark or tradename as she may have to a monopoly of her type of bitter water, by preventing manufacturers from telling the public in a way that will be understood, what they are copying and trying to sell. But the plaintiff has no patent for the water, and the defendants have a right to reproduce it as nearly as they can. *They have a right to tell the public what they are doing, and to get whatever share they can in the popularity of the water by advertising that they are trying to make the same article, and think that they succeed. If they do not convey, but, on the contrary, exclude, the notion that they are selling the plaintiff's goods, it is a strong proposition that when the article has a well-known name they have not the right to explain by that name what they imitate. By doing so, they are not trying to get the good will of the name, but the good will of the goods.* 216 U.S. at 380–381, 30 S.Ct. at 298, 299 (citations omitted) (emphasis added.)[6]

In Viavi Co. v. Vimedia Co., plaintiff sold unpatented proprietary medicinal preparations under the registered trademark "Viavi," and local sellers of defendant's medicinal preparations represented to prospective purchasers that Vimedia products "were the same or as good as Viavi" preparations. The court held, "[i]n the absence of such a monopoly as a patent confers, any persons may reproduce the articles, if they can, and may sell them under the representation that they are the same article, if they exclude the notion that they are the plaintiff's goods." 245 F. at 292.[7]

In Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dept. Stores, Inc., the defendant used plaintiff's registered trademarks "Dior" and "Christian Dior" in defendant's advertising in identifying plaintiff's dresses as the original creations from which defendant's dresses were copied.[8] The district court refused to grant a preliminary injunction.

The appellate court considered plaintiff's rights under both the Lanham Act

---

5. Appellees mistakenly assert that *Saxlehner* did not involve a valid trademark. The lower courts held that the name "Hunyadi" was available to all because it had become descriptive of a type of water, but that the words "Hunyadi Janos" constituted a valid trademark. See 157 F. 745, 747 (6 Cir.). The Supreme Court accepted these determinations.

6. Other Supreme Court decisions applying similar principles in distinguishable factual circumstances include Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 231–232, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 237–238, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 129–130, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947); Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 119– 122, 59 S.Ct. 109, 83 L.Ed. 73 (1938); Prestonettes, Inc. v. Coty, 264 U.S. 359, 368–369, 44 S.Ct. 350, 68 L.Ed. 731 (1924); Canal Co. v. Clark, 80 U.S. (13 Wall.) 311, 322–324, 20 L.Ed. 581 (1871).

7. Appellees state that the advertisements placed by Vimedia did not use Viavi's trademark. Whether the descriptive use was employed in advertisements or in salesmen's spiels is irrelevant.

8. Defendant described its dresses in newspaper advertisements as copies of Dior's original creations. Tags were hung on each garment reading "Original by Christian Dior—Alexander's Exclusive—Paris —Adaptation." "Dior" or "Christian Dior" appeared more than a dozen times in a singing commercial on defendant's television fashion show. 299 F.2d at 35 & n. 1.

and common law.[9] Noting that the representation that defendant's dresses were copies of "Dior" originals was apparently truthful and that there was no evidence of deception or confusion as to the origin or sponsorship of defendant's garments (299 F.2d at 35), the court disposed of the claim of right under the Lanham Act as follows:

In any proceeding under the Lanham Act the gist of the proceeding is a "false description or representation," 15 U.S.C.A. § 1125(a), or a use of the mark which "is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services," 15 U.S.C.A. § 1114 (1). * * * Registration bestows upon the owner of the mark the limited right to protect his good will from possible harm by those uses of another as may engender a belief in the mind of the public that the product identified by the infringing mark is made or sponsored by the owner of the mark. * * * *The Lanham Act does not prohibit a commercial rival's truthfully denominating his goods a copy of a design in the public domain, though he uses the name of the designer to do so. Indeed it is difficult to see any other means that might be employed to inform the consuming public of the true origin of the design.* 299 F.2d at 36 (citations omitted) (emphasis added).

The court also rejected the claim of right under common law principles of unfair competition, stating:

Common law unfair competition must be grounded in either deception or appropriation of the exclusive property of the plaintiff. * * *

In the case at bar it is conceded that the "pirating" of the design is lawful and proper. * * * The only property · right alleged to have been invaded is the good will embodied in the trademark. But the right of the complainant in his mark is limited to dilution which is brought about by confusion as to source or affiliation. 299 F.2d at 36 (citations omitted).

The court weighed the underlying interests in this language:

Involved in the instant case is a conflict of values which necessarily arises in an economy characterized by competition and private property. The courts have come to recognize the true nature of the considerations often involved in efforts to extend protection of common law trade names so as to create a shield against competition. * * * The interest of the consumer here in competitive prices of garments using Dior designs without deception as to origin, is at least as great as the interest of plaintiffs in monopolizing the same. 299 F.2d at 37 (citations omitted).[10]

We have found no holdings by federal or California appellate courts contrary to the rule of these three cases. Moreover, the principle for which they stand —that use of another's trademark to identify the trademark owner's product in comparative advertising is not prohibited by either statutory or common law, absent misrepresentation regarding the products or confusion as to their

---

9. Appellees argue that the Court of Appeals held only that denial of the preliminary injunction was not an abuse of the district court's discretion. But as the Court of Appeals said, because the denial rested upon the district court's conclusions as to the law, "the appellate court can, and should review such conclusions." 299 F.2d at 36. The Court of Appeals therefore examined and decided the underlying, substantive legal issues.

10. Other Courts of Appeals decisions sustaining nonconfusing descriptive uses of valid trademarks owned by others include Trail Chevrolet, Inc. v. General Motors Corp., 381 F.2d 353, 354 (5th Cir. 1967), and American-Marietta Co. v. Krigsman, 275 F.2d 287, 290 (2d Cir. 1960). But see Smith Kline & French Laboratories v. Broder, 125 U.S.P.Q. 299 (S.D.Tex. 1959).

source or sponsorship—is also generally approved by secondary authorities.[11]

■ The rule rests upon the traditionally accepted premise that the only legally relevant function of a trademark is to impart information as to the source or sponsorship of the product.[12] Appellees argue that protection should also be extended to the trademark's commercially more important function of embodying consumer good will created through extensive, skillful, and costly advertising. The courts, however, have generally confined legal protection to the trademark's source identification function for reasons grounded in the public policy favoring a free, competitive economy.

■ Preservation of the trademark as a means of identifying the trademark owner's products, implemented both by the Lanham Act and the common law, serves an important public purpose.[13] It makes effective competition possible in a complex, impersonal marketplace by providing a means through which the consumer can identify products which please him and reward the producer with continued patronage. Without some such method of product identification, informed consumer choice, and hence meaningful competition in quality, could not exist.[14]

On the other hand, it has been suggested that protection of trademark values other than source identification would create serious anti-competitive consequences with little compensating public benefit. This is said to be true for the following reasons.

The object of much modern advertising is "to impregnate the atmosphere of the market with the drawing power of a congenial symbol." Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942),[15] rather than to

11. See, e. g., Alexander, Honesty and Competition 50–51 (1967); Restatement of Torts § 717, comment *c*, § 727, comment *a* (1938); Livermore, On Uses of a Competitor's Trademark, 20 Stan.L. Rev. 448, 451–52, 458 (1968); Gaughan, Advertisements Which Identify "Brand X," 35 Fordham L.Rev. 445, 446–47, 456–57 (1967); Symposium, "Honest" Truth or Unfair Competition, 53 Trademark Rep. 225, 233 (1963); cf. Stern & Hoffman, Public Injury and the Public Interest: Secondary Meaning in the Law of Unfair Competition, 110 U.Pa.L.Rev. 935, 950–51, 956, 960 (1962). But see 3 Callmann, Unfair Competition and Trademarks § 84.2(b) (2d ed. 1950); Callmann, Trademark Infringement and Unfair Competition, 14 Law & Contemp. Prob. 185, 193 (1949).

12. In addition to the decisions discussed in the text, see, e. g., Prestonettes, Inc. v. Coty, 264 U.S. 359, 368, 44 S.Ct. 350, 68 L.Ed. 731 (1924); Canal Co. v. Clark, 80 U.S. (13 Wall.) 311, 322–323, 20 L.Ed. 581 (1871); Hygienic Specialties Co. v. H. G. Salzman, Inc., 302 F.2d 614, 619 (2d Cir. 1962).

13. It also serves two substantial private interests of the owner: It protects him from diversion of sales through a competitor's use of his trademark or one confusingly similar to it; and it protects his reputation from the injury that could

occur if the competitor's goods were inferior.

14. See generally, Livermore, supra note 11 at 448; Developments in the Law—Competitive Torts, 77 Harv.L.Rev. 888, 890 (1964); Brown Advertising and the Public Interest, 57 Yale L.J. 1165, 1185–86 (1948). On the other hand, it has been argued that these public benefits are outweighed by the monopolistic consequences inherent in the protection of trademarks, and that consumer interests could be better protected by other means. E. Chamberlin, The Theory of Monopolistic Competition 59–62, 270–74 (7th ed. 1960). See also Brown, supra, at 1205–06.

15. Justice Frankfurter's powerful dictum does not imply that these values are entitled to legal protection independently of use of the trademark in a manner creating confusion as to source. In *Mishawaka Rubber*, the district court found that source-confusing use had occurred, and there was no appeal from this finding of infringement. The only issue before the Supreme Court was the criteria to be applied in determining damages. 316 U.S. at 204–205, 62 S.Ct. 1022. The district court held that the burden rested upon the trademark owner to show that but for the infringement particular customers would have purchased the trademark owner's goods

communicate information as to quality or price. The primary value of the modern trademark lies in the "conditioned reflex developed in the buyer by imaginative or often purely monotonous selling of the mark itself." Derring, Trademarks on Noncompetitive Products, 36 Or.L.Rev. 1, 2 (1956). To the extent that advertising of this type succeeds, it is suggested, the trademark is endowed with sales appeal independent of the quality or price of the product to which it is attached; economically irrational elements are introduced into consumer choices; and the trademark owner is insulated from the normal pressures of price and quality competition. In consequence the competitive system fails to perform its function of allocating available resources efficiently.[16]

Moreover, the economically irrelevant appeal of highly publicized trademarks is thought to constitute a barrier to the entry of new competition into the market. "[T]he presence of irrational consumer allegiances may constitute an effective barrier to entry. Consumer allegiances built over the years with intensive advertising, trademarks, trade names, copyrights and so forth extend substantial protection to firms already in the market. In some markets this barrier to entry may be insuperable." Papandreou, The Economic Effects of Trademarks, 44 Calif.L.Rev. 503, 508–09 (1956).[17] High barriers to entry tend,

in turn, to produce "high excess profits and monopolistic output restriction" and "probably * * * high and possibly excessive costs of sales promotion." J. Bain, Barriers to New Competition 203 (1955).

A related consideration is also pertinent to the present case. Since appellees' perfume was unpatented, appellants had a right to copy it, as appellees concede.[18] There was a strong public interest in their doing so, "[f]or imitation is the life blood of competition. It is the unimpeded availability of substantially equivalent units that permits the normal operation of supply and demand to yield the fair price society must pay for a given commodity." American Safety Table Co. v. Schreiber, 269 F.2d 255, 272 (2d Cir. 1959).[19] But this public benefit might be lost if appellants could not tell potential purchasers that appellants' product was the equivalent of appellees' product. "A competitor's chief weapon is his ability to represent his product as being equivalent and cheaper * *." Alexander, Honesty and Competition, 39 So.Cal.L.Rev. 1, 4 (1966). The most effective way (and, where complex chemical compositions sold under trade names are involved, often the only practical way) in which this can be done is to identify the copied article by its trademark or trade name. To prohibit use of a competitor's trademark for the sole purpose of identifying the competitor's

---

rather than those of the infringer. The Supreme Court reversed, holding that under § 19 of the Trade-Mark Act of 1905, the infringer had the burden of proving that its sales were made "for *any reason other than a response to the diffused appeal of the plaintiff's symbol* * * *." Id. at 206, 62 S.Ct. at 1024.

16. See E. Chamberlin, supra note 14, at 270–74; J. Bain, Barriers to New Competition 114–15 (1956); Livermore, supra note 11, at 449–50 and authorities cited. See also Timberg, Trade-Marks, Monopoly, and the Restraint of Competition, 14 Law & Contemp.Prob. 323 (1949); Auerbach, Quality Standards, Informative Labeling, and Grade Labeling, 14 Law & Contemp.Prob. 362

(1949); Treece, Protectability of Product Differentiation, 18 Rutgers L.Rev. 1019, 1020–22 (1964).

17. See also J. Bain, supra note 16, at 116, 142, 216.

The Supreme Court recently noted the anti-competitive consequences of barriers to new entry created by extensive trademark advertising in FTC v. Procter & Gamble Co., 386 U.S. 568, 578–579, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967).

18. See text at note 3, supra.

19. Accord, Hygienic Specialties Co. v. H. G. Salzman, Inc., 302 F.2d 614, 619 (2d Cir. 1962). See also E. Chamberlin, supra note 14, at 273–74.

product would bar effective communication of claims of equivalence.[20] Assuming the equivalence of "Second Chance" and "Chanel No. 5," the public interest would not be served by a rule of law which would preclude sellers of "Second Chance" from advising consumers of the equivalence and thus effectively deprive consumers of knowledge that an identical product was being offered at one third the price.

As Justice Holmes wrote in Saxlehner v. Wagner, the practical effect of such a rule would be to extend the monopoly of the trademark to a monopoly of the product. The monopoly conferred by judicial protection of complete trademark exclusivity would not be preceded by examination and approval by a governmental body, as is the case with most other government-granted monopolies. Moreover, it would not be limited in time, but would be perpetual.[21]

Against these considerations, two principal arguments are made for protection of trademark values other than source identification.

The first of these, as stated in the findings of the district court, is that the creation of the other values inherent in the trademark require "the expenditure of great effort, skill and ability," and that the competitor should not be permitted "to take a free ride" on the trademark owner's "widespread goodwill and reputation." [22]

✦ ▇▇ A large expenditure of money does not in itself create legally protectable rights.[23] Appellees are not entitled to monopolize the public's desire for the unpatented product, even though they themselves created that desire at great effort and expense.[24] As we have noted, the most effective way (and in some cases the only practical way) in which others may compete in satisfying the demand for the product is to produce it and tell the public they have done so, and if they could be barred from this effort appellees would have found a way to acquire a practical monopoly in the unpatented product to which they are not legally entitled.

Disapproval of the copyist's opportunism may be an understandable first reaction, "[b]ut this initial response to the problem has been curbed in deference to the greater public good." American Safety Table Co. v. Schreiber, 269 F.2d at 272. By taking his "free ride," the copyist, albeit unintentionally, serves an important public interest by offering comparable goods at lower prices. On the other hand, the trademark owner,

---

20. See Timberg, supra note 16, at 330, 333.

21. Cf. Stern & Hoffman, supra note 11, at 950–51.

22. The findings referred to read as follows:

Without regard to the truth or falsity of the statements made in defendant's advertisement and notwithstanding the fact that the plaintiff's toilet preparations are not protected by the patent laws, defendant's advertisement, viewed in its entirety, attempts to and does take advantage of, and appropriates from plaintiffs, the goodwill, reputation and commercial values inherent in the trademarks which plaintiffs have created over many years from the expenditure of great effort, skill and ability. The sole commercial value flowing to defendant from this form of advertising is the commercial value which attaches to his products by reason of their asserted equivalence to products sold under the trademark "Chanel No. 5" * * *. Defendant by the advertising scheme adopted herein is actually attempting to take a free ride on plaintiffs' widespread goodwill and reputation.

Chanel, Inc. v. Smith, 151 U.S.P.Q. 683, 687 (N.D.Cal.1966). See also 3 Callmann, supra note 11, § 84.2(b) (2d ed. 1950).

23. See Treece, supra note 16 at 1019, 1025 n. 15.

24. Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 231, 84 S.Ct. 784, 11 L.Ed. 2d 661 (1964); Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 122, 59 S.Ct. 109, 83 L.Ed. 73 (1938). See also Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 129–130, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947); Saxlehner v. Wagner, 216 U.S. 375, 380–381, 30 S.Ct. 298, 54 L.Ed. 525 (1910).

perhaps equally without design, sacrifices public to personal interests by seeking immunity from the rigors of competition.

Moreover, appellees' reputation is not directly at stake. Appellants' advertisement makes it clear that the product they offer is their own. If it proves to be inferior, they, not appellees, will bear the burden of consumer disapproval. Cf. Prestonettes, Inc. v. Coty, 264 U.S. 359, 369, 44 S.Ct. 350, 68 L.Ed. 731 (1924).[25]

The second major argument for extended trademark protection is that even in the absence of confusion as to source, use of the trademark of another "creates a serious threat to the uniqueness and distinctiveness" of the trademark, and "if continued would create a risk of making a generic or descriptive term of the words" of which the trademark is composed.[26]

The contention has little weight in the context of this case. Appellants do not use appellees' trademark as a generic term. They employ it only to describe appellees' product, not to identify their own. They do not label their product "Ta'Ron's Chanel No. 5," as they might if appellees' trademark had come to be the common name for the product to which it is applied. Appellants' use does not challenge the distinctiveness of appellees' trademark, or appellees' exclusive right to employ that trademark to indicate source or sponsorship. For reasons already discussed, we think appellees are entitled to no more. The slight tendency to carry the mark into the common language which even this use may have is outweighed by the substantial value of such use in the maintenance of effective competition.

We are satisfied, therefore, that both authority and reason require a holding that in the absence of misrepresentation or confusion as to source or sponsorship a seller in promoting his own goods may use the trademark of another to identify the latter's goods. The district court's contrary conclusion cannot support the injunction.

---

25. In addition, if appellants' specific claims of equivalence are false, appellees may have a remedy under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1964), which provides a civil remedy to a person injured by "any false description or representation, including words or other symbols * * *." of goods in interstate commerce. See Societe Comptoir de L'Industrie Cotonniere Establissements Boussac v. Alexander's Dept. Stores, Inc., 299 F.2d 33, 36 (2d Cir. 1962) (semble); Livermore, supra note 11, at 453–57; Developments in the Law—Competitive Torts, 77 Harv.L.Rev. 888, 907–08 (1964).

A common-law remedy may also be available. See Restatement (Second) of Torts § 712, comment *b* at 17 (Tent. Draft No. 8, 1963). For discussion of the possible common-law theories, see Developments in the Law, supra, at 892–907.

Appellees argue that "there is at least a prima facie presumption of difference" between their product and appellants' and that a "diffferent rule would prevent the owner of a secret process from protecting it except by giving up his secret." Jacobs v. Beecham, 221 U.S. 263, 271, 31 S.Ct. 555, 556, 55 L.Ed. 729 (1911). Appellees cannot be heard to argue for a "presumption" inconsistent with their explicit assumption of equivalence made both below and in this court for the purposes of this proceeding. Because of that assumption, appellants were not called upon to prove equivalence, even assuming the burden to do so rested upon them. If the issue arises on remand, procedures are available for protecting the secrecy of appellees' product formula. Cohn & Zuckman, FCC v. Schreiber: In Camera and the Administrative Agency, 56 Geo.L.J. 451–52 (1968).

26. The court below stated that:
The offending advertisement, by the nature in which it uses plaintiffs' trademark, creates a serious threat to the uniqueness and distinctiveness of plaintiffs' marks. Defendant's unauthorized use of such trademarks if continued would create a risk of making a generic or descriptive term of the words "Chanel" and "Chanel No. 5".
151 U.S.P.Q. at 687. See also 3 Callmann, supra note 11, at § 84.2(b); Callmann, Trademark Infringement and Unfair Competition, 14 Law & Contemp.Prob. 185, 193 (1949).

## II

The district court also rested the injunction upon an alternate ground, stated in the following finding:

> Defendant's method of competition colorably, but fictitiously, invites comparison of the toilet preparations he sells with those of plaintiffs. In fact, it negates the opportunity for comparison by soliciting volume mail order purchases, at discount rates, without the dealer actually having the benefit of personal comparison. This method of marketing a competing product may place Ta'Ron's "duplicates" in the hands of unscrupulous dealers and occasion further unfair practices and deception which creates a likelihood of confusion on the part of prospective customers as to whether such products are in fact "identical" or "duplicates" and are derived from the same source and produced by the same methods.

The opening sentence of this finding misreads the advertisement. The persons to whom the advertisement is directed were purchasers for resale. The advertisement suggests use of the comparison test in reselling to "skeptical" consumers, and nothing prevents the consumers from comparing before purchasing if they wish to do so. The wholesale purchasers themselves are protected from deception by a promise of "Satisfaction Guaranteed," entitling them to return the merchandise if the goods prove disappointing.

■ The second sentence of the finding apparently invokes the principle that "[o]ne fraudulently markets his goods as those of another if, though making no misrepresentation himself, he intentionally induces his purchasers so to market them." Restatement of Torts § 713 (1938).[27] As we have noted, appellees concede that neither the packaging nor labeling of appellants' product is misleading or confusing.[28] Conceivably, dealers may nonetheless tell their customers that the labels are false and that the contents are in fact appellees' product. But where, as here, the appellants have done all that could reasonably be expected to avoid confusion, the speculative possibility of deliberate fraud by third persons is not a sufficient basis for injunctive relief.

There is a suggestion in this portion of the finding, and in appellees' brief, that appellants really claim only to have duplicated the scent of appellees' product as distinguished from its other characteristics, and that appellants' proposed method of distribution invites false representations that both the product and "methods" of production have been precisely duplicated.

The relevance of the reference to "methods" of production in the court's finding is not clear. If all of the original product's characteristics are found in the copy, the method by which that result was achieved is of no significance to the purchaser. See Livermore, supra note 11, at 456.

We would agree that if appellants really claim less than exact duplication of the qualities inherent in the product itself, it would have been appropriate to require some clarification of the language of their advertisement. But this narrow issue was not presented below, and the order entered could not be sustained if it had, for the injunction broadly prohibits any reference at all to appellees' trademark in the promotion or sale of appellants' product. Cf. William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 532–533, 44 S.Ct. 615, 68 L.Ed. 1161 (1924).

Reversed and remanded for further proceedings.

27. See also Restatement of Torts § 728, comment *d*; Restatement (Second) of Torts § 713, comment *a* (Tent. Draft No. 8, 1963).

28. See note 4 and related text.