**Lord Simon CAIRNS, et al., Plaintiffs,**

v.

**FRANKLIN MINT CO., et al., Defendants.**

**No. CV98–3847–FMC(BQRx).**

United States District Court, C.D. California.

June 27, 2000.

Shari Mulrooney Wollman, Mark S. Lee, Seth A. Gold, Alison Spear Ullendorff, Manatt, Phelps & Phillips, Los Angeles, CA, Cara R. Burns, Gradstein, Luskin & Van Dalsem, Los Angeles, CA, for Plaintiff.

Robert A. Meyer, Douglas E. Mirell, Daniel J. Friedman, Lisa Lyn Horlick, Robert N. Treiman, Loeb & Loeb, Los Angeles, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION ON DEFENDANTS' AFFIRMATIVE DEFENSES

COOPER, District Judge.

### I. Introduction

Plaintiffs are the executors of the Estate of Diana, Princess of Wales (the "Estate"), and the trustees of the Diana, Princess of Wales Memorial Fund (the "Fund"). Defendants sell jewelry, commemorative plates, sculptures and dolls depicting Princess Diana. Plaintiffs asserted claims against all defendants for (1) false endorsement under 15 U.S.C. § 1125(a); (2) federal trademark dilution under 15 U.S.C. § 1125(c); (3) infringement of California's statutory right of publicity; (4) false advertising under 15 U.S.C. § 1125(a); and (5) unfair competition and false advertising under California Code § 17200. Additional facts will be discussed as necessary below. A detailed recitation of the factual and procedural background of this case is found in this Court's order of October 16, 1998, published at *Lord Simon Cairns, et*

*al. v. Franklin Mint,* 24 F.Supp.2d 1013, 1021–1022 (C.D.Cal.1998).

Plaintiffs' third claim for relief was dismissed by this Court on October 18, 1998. Defendants have moved for summary adjudication of each of plaintiffs' remaining claims. Plaintiffs have moved for summary adjudication of defendants' affirmative defenses.

## II. Standard

Summary judgment or summary adjudication is only proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. Rule Civ. Proc. 56(c); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. Proc. 56(e), Summary judgment is appropriate where the nonmoving party fails to make a sufficient showing on an essential element of the case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. Plaintiffs' Claim for False Endorsement

Plaintiffs' complaint alleges that defendants' use of the image and title of Princess Diana falsely implies an endorsement by, association with, or affiliation with the Estate and the Fund in violation of 15 U.S.C. § 1125(a). Plaintiffs do not allege that defendants use a particular photograph, depiction or image of Princess Diana. Instead, they contend that *any* use of Princess Diana's image or the words "Diana, Princess of Wales" by defendants falsely implies endorsement by the Estate or the Fund. Although plaintiffs have marks of their own,[1] they have framed their claim as one for false endorsement based on the use of Princess Diana's image and title. It is undisputed that defendants do not use either of the plaintiffs' marks.

### A. *Use of a Celebrity's Image*

It is clear that not all uses of a celebrity's image are actionable under § 1125(a). Only uses which suggest sponsorship or approval are prohibited. Unlike the broader right of publicity, which is infringed by the "unpermitted use of a person's identity" containing "no false inference that plaintiff endorses or approves the product," § 1125(a) prohibits only *false endorsement,* not mere use of an image or name. 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 28:14 (4th ed.1996) (emphasis added). Indeed, "competitors may use a rival's trademark in advertising and other channels of communication if the use is not false or misleading." *New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302, 307 (9th Cir.1991); *see also Smith v. Chanel, Inc.* 402 F.2d 562, 563 (9th Cir.1968) (use of a trademark to describe one's own product as a replica of the trademarked product does not constitute trademark infringement).

A false endorsement claim based on the unauthorized use of a celebrity's identity is a type of false association claim for it alleges that misuse of a trademark "which is likely to confuse consumers as to the plaintiff's sponsorship or approval of the product." *Wendt v. Host Int'l, Inc.,* 125 F.3d 806, 812 (9th Cir.1997); *see also Abdul-Jabbar v. General Motors Corp.,* 85

---

1. The Estate uses a crest consisting of a "D" below the Spencer family coronet as its mark.

The Fund uses a stylized "DIANA" signature above the full name of the Fund as its mark.

F.3d 407, 410 (9th Cir.1996); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992); *White v. Samsung Electronics America, Inc.*, 971 F.2d 1395, 1399 (9th Cir.1992).

■ In each of the false endorsement cases, the celebrities' images were used in commercial advertising to promote a product and clearly communicated an endorsement. *See e.g. Wendt*, 125 F.3d at 809 (use of actors' likenesses on animatronic figures in marketing "Cheers" bars); *Abdul-Jabbar*, 85 F.3d at 409 (use of Abdul-Jabbar's given name in car commercial); *Waits*, 978 F.2d at 1097 (use of likeness of Waits' distinctive voice in Doritos commercial); *White*, 971 F.2d at 1396 (use of White's likeness as a robot in television commercials for VCRs). As the Ninth Circuit observed in *Abdul-Jabbar*, "the use of celebrity endorsements in television commercials is ... well established by commercial custom." *Abdul-Jabbar*, 85 F.3d at 413. In each of these cases where defendants' uses clearly implied an endorsement, *see McCarthy, supra*, at § 28:14, the Ninth Circuit analyzed the likelihood of consumer confusion as to the celebrities' endorsement by using the factors set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979).

Although these cases clearly establish the right of a living celebrity to assert a claim for false endorsement, as this Court has observed in this case, "neither the availability nor the parameters of a false endorsement claim brought by the estate of a celebrity have been established." *Lord Simon Cairns, et al. v. Franklin Mint*, 24 F.Supp.2d at 1032. Plaintiffs point to no authority to support their contention that they may assert a claim based on the use of Princess Diana's image. Instead, they present evidence that the Patent and Trademark Office ("PTO") has permitted estates of other celebrities to register trademarks based on the celebri-

ties' images, The trademark registrations demonstrate that the PTO has permitted estates of celebrities to register the names of the celebrities as trademarks. *See* Dec. Lee, Ex. 1. With the exception of the registration for James Dean, each registration states that the trademark is for the "words only" of the celebrities' name. *See id.* A profile design of James Dean is registered as a design mark in addition to the trademark for his name. *See id.* at 1–30. No evidence presented to the Court supports plaintiffs' contention that any and all uses of a celebrity's image may be the subject of a trademark registration. Although it is clear that living celebrities have broad rights in preventing others from using their image to imply endorsement, it is not clear that a deceased celebrity's estate possesses the same scope of endorsement rights. Accordingly, the Court hesitates to import, en masse, the analysis employed in the Ninth Circuit's false endorsement cases to the facts of this case.

Adding to the Court's reluctance is the fact that defendants' use of Princess Diana's image in this case is clearly distinguishable from that found in the false endorsement cases. In this case, defendants use Princess Diana's image on their products rather than in advertising to sell unrelated products.[2] Obviously the advertising for defendants' products necessarily employs the image of Princess Diana and her title to describe the products. Nonetheless, defendants' sale of Princess Diana's image is vastly different from the advertising use of celebrities' likenesses in selling restaurant chains, cars, Doritos and VCRs. *See Wendt*, 125 F.3d at 809; *Abdul-Jabbar*, 85 F.3d at 409; *Waits*, 978 F.2d at 1097; *White*, 971 F.2d at 1396.

Defendants' use in this case is more akin to that found in *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d

---

**2.** Indeed, it is readily understood that consumers purchase defendants' products because they bear Princess Diana's image. In contrast, the images of the celebrities in the endorsement cases were used only to advertise an unrelated product that did not bear their image.

302 (9th Cir.1991), where newspapers used a photo of the musical group along with its name to advertise their reader polls about the group. In that case, the Ninth Circuit held that nominative use of celebrities' images and names is outside the protection of trademark law. "Because it does not implicate the source-identification function that is the purpose of trademark, it does not constitute unfair competition[.]" *New Kids*, 971 F.2d at 308. Although the *New Kids* court reached the above conclusion in analyzing defendants' fair use defense, the same threshold consideration is applicable to this case; does defendants' use of the image and title of Princess Diana serve to identify the source of any product? In short, are they used as trademark? If not, defendants' use cannot amount to use as an endorsement.

American artist Andy Warhol's vast collection of work contains several brightly-colored depictions of well known consumer goods. His paintings, "Campbell's Tomato Soup Can" and "Three Coke Bottles" contain, as the titles imply, images of readily identifiable trademarks. Although not submitted by the parties, the Court takes judicial notice of the following pages on the Warhol Museum's internet site which sells posters and other products featuring Warhol's work. *See* The Warhol Museum, *The Warhol Store*, (visited June 6, 2000) <http:// www.imageexchange.com/featured/warhol/ 3126.shtml> (poster of "Three Coke Bottles"); *id.* at <http://www.imageexchange.com/featured/warhol/3244.shtml> (poster of "Campbell's Tomato Soup Can"). The site also sells a poster of Warhol's "Princess Diana." *See id.* at <http://www.imageexchange.com/featured/warhol/ 6136.shtml>. Both Campbell's and Coca–Cola's script names are protected by trademark. As observed by the Supreme Court in *Qualitex Co. v. Jacobson Prod. Co., Inc.*, the shape of Coca–Cola's bottle has been authorized for use as a mark by both courts and the Patent and Trademark Office. 514 U.S. 159, 162, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). After *Qualitex*, it is likely that Campbell's could successfully protect its red and white label from use by others. Because Warhol does not use the trademarked names or product designs to identify the source of the painting, his use does not imply endorsement of the artwork by either Campbell's or Coca–Cola. Similarly, advertising for Warhol's artwork that uses Campbell's and Coca–Cola's images and names to describe Warhol's work does not imply endorsement.

Defendants' use of the image of Princess Diana on their products and the words "Diana, Princess of Wales," to describe their products does not imply endorsement by plaintiffs. Because defendants' use does not implicate the source-identification purpose of trademark protection, it falls outside the scope of § 1125(a), and defendants are entitled to summary adjudication of the false endorsement claim as a matter of law. *Cf. New Kids*, 971 F.2d at 308 (uses that do not serve to identify the source of a product do not imply endorsement).

### B. *Likelihood of Confusion*

In any event, the evidence establishes that there is no likelihood that consumers will be confused about plaintiffs' endorsement of defendants' products.

The factors set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), are generally used to determine the likelihood of confusion concerning a celebrity's endorsement; (1) strength of the mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) degree of care consumers are likely to exercise when purchasing; (7) intent of defendants in selecting the mark; and (8) likelihood that the parties will expand their product lines. *See Wendt*, 125 F.3d at 811; *White*, 971 F.2d at 1400. This list of factors is neither exhaustive nor exclusive. *See E.J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir.1992). "Other variables may come into play depending on the particular facts presented." *Sleekcraft*, 599 F.2d at 348 n. 11,

citing *Triumph Hosiery Mills, Inc. v. Triumph International Corp.*, 308 F.2d 196, 198 (2nd Cir.1962). The Court has found that an additional factor, the strength of the association between the mark and plaintiffs, is necessary to analyzing the likelihood of confusion in this case. *See Lord Simon Cairns*, 24 F.Supp.2d at 1038–39.

*Strength of Association Between the Mark and Plaintiffs*

■ The Marks at issue in this case are the image of Princess Diana and her title "Diana, Princes of Wales." The strength of the association between the Marks and plaintiffs is a critical factor in analyzing the likelihood of confusion in this case. If the association is weak, there is little likelihood of confusion. If the association is strong, then any use of the image by others could lead consumers to assume plaintiffs are associated with the product.

"[P]ervasive unauthorized use of a celebrity's persona will tend to dull the popular perception that use of that persona signifies an endorsement at all, weakening the initial automatic association between the celebrity and his or her estate. In extreme cases, use of the celebrity's persons may no longer 'implicate the source-identification function that is the purpose of trademark' and may, therefore, constitute a fair use 'because it does not imply sponsorship or endorsement by the trademark holder.'" *Lord Simon Cairns*, 24 F.Supp.2d at 1039.

The Lanham Act explicitly anticipates that the source-identification function of a mark may be destroyed by widespread and uncontested use of the mark by those other than the mark holder. Section 1127 states that "[a] mark shall be deemed to be 'abandoned' ... [W]hen any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services or in connection with which it is used or otherwise *lose its significance as a mark.*" (emphasis added).

Evidence demonstrates that defendants have been selling products bearing Princess Diana's image and title since about 1981. *See* Gold Dec. in support of plaintiffs' motion on laches, Ex. C., Lucker Dec. at ¶ 2. It is undisputed that others have also sold such products since that date. One collector has nearly 2,500 items bearing Princess Diana's image. *See* Papa Dec., Ex. 1, Nobles Dep. at 6. At least three books identify and value Princess Diana memorabilia. *See* Papa Dec., Ex. 1–3, CHARLES NOBLES, COLLECTING ON A PRINCESS; GEOFFREY WARREN, BRITISH ROYAL COMMEMORATIVES; AUDREY B. ZEDER, BRITISH ROYAL COMMEMORATIVES WITH PRICES. With this vast inventory of products sold by innumerable sources, the image of Princess Diana on a product provides consumers with no suggestion that the product is associated with her, the Estate or the Fund. Her image has truly lost any significance as a mark identifying the source of a product.

It is clear that Princess Diana knew of the vast commercial uses of her image. *See* Papa Dec., Ex. 13, Kydd Dep. 153:6–24, 155:5–21. Indeed it is impossible to imagine how she could not have known. Although Princess Diana was selective in choosing charities to endorse, there is no evidence to suggest that she attempted to curb the sale of consumer products bearing her likeness. Plaintiffs' entry into the marketplace for Princess Diana memorabilia at this late date cannot change the fact that Princess Diana did nothing to prevent others from using her image while she was alive.

Ample evidence before the Court demonstrates that the association between the image of Princess Diana and plaintiffs is negligible. The Court finds that the weak association between the Marks and plaintiffs weighs heavily against finding a likelihood of confusion.

*Degree of Consumer Care*

Plaintiffs contend that because the price of defendants' products is relatively low, ranging from $29.95 to $595.00, consumers

will not exercise a high degree of care. Plaintiffs point to the Ninth Circuit's conclusion in *White* that "consumers are not likely to be particularly careful in determining who endorses VCRs, making confusion ... more likely." *White,* 971 F.2d at 1400. They argue that because the price of defendants' products is comparable to, or lower than, the cost of the VCRs advertised in *White,* this Court should find that consumers will be less careful in purchasing defendants' products. Opposition at 19.

Although price is not the only factor determining how much care purchasers will exercise,[3] the Court does not agree that the prices of defendants' products are low. Unlike household appliances, defendants' products are decorative. Their price is sufficiently high to cause consumers to exercise a great deal of care. Moreover, the fact that entire books and websites are dedicated to identifying memorabilia, its source and value demonstrates a significant level of interest in Princess Diana memorabilia. This evidence also supports the Court's conclusion that the goods are not purchased impulsively.

Finally, this Court previously concluded that the publicity surrounding this case will make memorabilia collectors more careful in selecting merchandise should they desire products approved by plaintiffs. *See Lord Simon Cairns,* 24 F.Supp.2d at 1042. Although the publicity has subsided, the Court concludes that those interested in purchasing only products depicting Princess Diana that are endorsed by plaintiffs will continue to exercise a great deal of care.

Ample evidence demonstrates that consumers are likely to exercise a high degree of care when purchasing defendants' products, weighing against finding a likelihood of confusion.

*Defendants' Intent*

In determining defendants' intent in using the Marks, "[t]he relevant question is

whether defendants 'intended to profit by confusing consumers' concerning the endorsement of" their products. *See White,* 971 F.2d at 1400 (citation omitted). Because defendants began using Princess Diana's image and title while she was alive, the Court must determine whether defendants intended to imply Princess Diana's endorsement when they selected Princess Diana's image.

Plaintiffs point to evidence dealing with defendants' actions after Princess Diana's death to support their contention that defendants intended to infringe. *See* Opposition at 16–19. Plaintiffs also contend that defendants' efforts to secure licenses from other celebrity's estates demonstrates that it intended to infringe on their right to her image. Undisputed evidence demonstrates that defendants manufactured and sold products bearing Princess Diana's image well before her death. Thus, only defendants' intent at the time the use began is relevant to the Court's intent analysis. The Court will not engage in a separate intent analysis for defendants' products sold after Princess Diana's death. Moreover, plaintiffs have asserted their endorsement claim not on the use of their own marks but on the rights that passed to them upon the death of Princess Diana. They cannot now seek to change the focus of the inquiry.

Defendants' intent was to produce products bearing Princess Diana's image for sale to collectors. *See* Friedman Decl. Ex. 7, 255–56. There is no evidence defendants intended to imply the endorsement of anyone. This factor weighs against finding a likelihood of confusion.

*Actual Consumer Confusion*

Parties present ample evidence that consumers were confused as to whether "Princess Diana's Charities" referred to the Fund and whether defendants were required to get permission from plaintiffs

---

**3.** Indeed the *White* court did not identify price as a factor in its finding of lack of consumer care.

before using the title or likeness of Princess Diana.[4] Only actual consumer confusion as to plaintiffs' endorsement of defendants' products based on defendants' representations is relevant to the Court's analysis of this factor.

Plaintiffs argue that "[o]ver 15 Franklin Mint customers have stated, under oath, that Franklin Mint's advertising actually confused them into believing that Defendants' products were authorized by Plaintiffs." Opposition at 15. After reviewing the evidence, the Court concludes that ten customers stated that defendants' advertising implied or led them to believe that the Estate or the Fund authorized or was associated with the products. *See* Gold Dec.: 1–21:10–11; 2–48:19–23; 3–109:12–15; 6–290:9–24; 7–332:15–19; 9–491:16–19; 13–647:23–27; 15–696:13–25, 15–697:1–6; 17–784:13–17; 18–813:16–18. In comparison, one customer stated that she assumed Franklin had permission because "Franklin Mint is a large, reputable corporation," another stated that she "took it for granted" they had permission, and finally a third "assumed" they had permission. None of these customers attributed their beliefs to advertising or other conduct by defendants. A customers' assumption that large corporations get permission from families or estates before producing products is not evidence of actual confusion.

Evidence that ten consumers were actually confused is minimal in light of the fact that defendants sold products bearing Princess Diana's likeness to over 300,000 customers between September 1, 1997, and March 24, 2000. *See* Marlo Dec. at ¶ 3.

Plaintiffs' evidence also includes a survey conducted by Dr. Ivan Ross. Survey evidence is to be admitted as long as the survey was conducted according to accepted principles and the results are relevant. *See Wendt,* 125 F.3d at 814. "Challenges to survey methodology go to the weight given the survey, not its admissibility." *Id.*

The survey concludes that 49.5% of the respondents "perceived that proceeds from, or authorization for, the sale of the advertised Diana, Princess of Wales memorabilia went to, or was authorized by, Diana, Princess of Wales and/or her family, estate, Foundation or other legal entity (other than the Franklin Mint)." *See* Dupont Dec., Ex. C. at 6–61. Unfortunately, the survey does not break down the 49.5% of respondents to identify what percentage "perceived" that defendants' products were authorized by the Estate or the Fund. Specifically, respondents beliefs about where proceeds from the sales would go or whether Princess Diana's family or an entity other than the Estate or the Fund is associated with defendants' products are not relevant to the Court's analysis. Without a specific percentage reflecting the number of respondents expressing confusion as to the plaintiffs' endorsement of defendants' product, the survey is not beneficial to the Court's analysis.

Even if plaintiffs provided a breakdown of survey results to the Court, there appears to be significant problems with the survey itself. The survey consisted of several questions. The first asked: "does the company or organization that is selling this Diana, Princess of Wales product need the permission or approval of any other company or organization before it could offer it for sale, or not?" *See* Dupont Dec., Ex. C. at 102. Whether or not permission is necessary is a separate question from endorsement and sheds no light on whether the respondent believed the product was endorsed by the plaintiffs.

Next, the 49.5% result was tabulated by counting any answer given by a respondent to a question that "reflected an understanding that the 'family,' 'estate,' 'Foundation,' or other similar entity was thought by respondent to have participated in the sale" of the product. *See* Dupont Dec., Ex. C. at 76, Initially, this method is

---

**4.** Indeed much of the evidence indicates that plaintiffs' publicity efforts were successful in making customers believe defendants were required to get their permission before using Princess Diana's image.

problematic because the "participation" of neither the "family" nor "other similar entity" is at issue in this case. Moreover, each question following the first dealt with who would receive proceeds from the sale of the product. Answers to the charity-related questions are irrelevant to determining actual confusion over the plaintiffs' endorsement of defendants' products. Because the tabulation method lumps responses to all questions together, it does not provide relevant information for the Court's analysis.

Finally, respondents' answers may have been tainted because they were shown three advertisements of Franklin Mint products: an Elvis Presley statue, a Marilyn Monroe doll and the Princess Diana doll. The Presley advertisement states that it is "authorized by Graceland" and identifies Elvis Presely Enterprises as the trademark holder. *See* Dupont Dec., Ex. C. at 98. The Monroe advertisement states that it is "Fully authorized by the Estate of Marilyn Monroe" and identifies trademark holders. *See* Dupont Dec., Ex. C. at 99. These advertisements may have led respondents to assume that because the Presley and Monroe products were "authorized" and contained trademark protected aspects, that the Princess Diana doll required similar authorization or permission. Even if plaintiffs provided an accurate breakdown of respondents' answers to the questions, the Court would attribute little weight to the results because the survey method provided respondents with information that may have led them to assume that authorization or permission to use Princess Diana's image was necessary.

Although plaintiffs have provided evidence of actual consumer confusion as to endorsement by plaintiffs, it is insignificant. Less than a dozen instances of actual confusion among a consumer group of over 300,000 can only be considered minimal. However, because the Court on sum-

mary judgment must weigh this evidence in favor of non-moving plaintiffs, the Court finds that there is evidence of actual confusion.

*Marketing Channels*

It is undisputed that plaintiffs do not market products bearing the image of Princess Diana themselves. To the extent they present evidence that others market products approved by the Fund on the same marketing channels as defendants, this factors weighs slightly in favor of finding a likelihood of confusion.

*Likelihood of Expansion*

Plaintiffs contend that the licenses granted by the Fund establish that the expansion of their product lines will result in overlap with defendants' product lines. The Fund has authorized at least 19 parties to use the title or likeness of Princess Diana in conjunction with products sold in the United States.[5] This evidence does not indicate that the Fund has authorized anyone to use Princess Diana's image on jewelry, dolls or plates.

The evidence presented in opposition to the motion for summary judgment does not support a finding that there is a likelihood that the plaintiffs' product line will expand to encompass the products sold by defendants.

*Similarity of Marks, Strength of Mark, and Relatedness of Goods*

In this case, the marks are identical to the extent they contain various images of Princess Diana. Because Princess Diana is known throughout the world, the marks are strong. *See Wendt*, 125 F.3d at 812 n. 1 *citing White*, 971 F.2d at 1400 ("the strength of the mark refers to the level of recognition the celebrity enjoys"). Finally, defendants' products are closely related to Princess Diana's fame associated with her status as a member of Britain's Royal

---

**5.** The list provided by plaintiffs states that the following products have been authorized: Tartan scarfs and shawls; Beanie Buddy; candle holder; memorial pin; scented candle; Beanie Baby; year 2000 calendar (2); dahlia; England's rose; commemorative stamps; tapestry kit; floral tribute photograph; commemorative coin; rose; funeral tape, CD and video; Candle in the Wind 1997; TN video; and tribute CD.

Family, a fashion ideal and a well-known humanitarian worker. *See White,* 971 F.2d at 1400 (the "goods" in celebrity endorsement cases are "the reasons for or source of the plaintiff's fame").

Each of these factors in the traditional likelihood of confusion analysis would weigh in favor of finding a likelihood of confusion. In this case however, each is severely mitigated by the Court's finding that there is a weak association between the image of Princess Diana and plaintiffs. If there is a lack of association between that image and plaintiffs, the similarity and strength of the marks are irrelevant to a likelihood of confusion as to endorsement. Similarly, the fact that goods are related is of no consequence without a showing of association between the image and the plaintiffs. The Court concludes that these factors have no bearing on the determination of whether consumers are likely to be confused as to plaintiffs' endorsement of defendants' products.

*Balancing*

The most important factor to this case: strength of association between the Marks and plaintiffs weighs heavily against finding a likelihood of confusion. Additionally, the high degree of care exercised by purchasers, lack of intent to imply endorsement and lack of a likelihood of expansion weigh against finding a likelihood of confusion. The strength of the mark, the relatedness of the goods, and the similarity of the marks are not considered in weighing the likelihood of confusion because each factor is undermined by the weak association between the image of Princes Diana and plaintiffs. Only the findings of minimal consumer confusion and convergent marketing channels weight in favor of finding a likelihood of confusion.

At the hearing on defendants' motion, plaintiffs' counsel argued that the Court improperly included a factor not found in the *Sleekcraft* test and improperly excluded three factors. Counsel argued that because the Court concluded that "five of the eight" *Sleekcraft* factors weighed in favor of finding a likelihood of confusion, the

issue must go to the jury. As explained above, "depending on the particular facts presented" other factors may be considered by the Court. *See Sleekcraft,* 599 F.2d at 348 n. 11. Moreover, it is clear that the *Sleekcraft* factors "should not be rigidly weighed; we do not count beans. 'Rather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion.' " *Dreamwerks Production Group v. SKG Studio,* 142 F.3d 1127, 1129 (9th Cir.1998) *quoting Gallo,* 967 F.2d at 1290 *see also Brookfield Communications Inc., v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1054 (9th Cir.1999) (the "test for likelihood of confusion is pliant. Some factors are much more important than others and the relative importance of each individual factor will be case-specific.").

Because the "mere possibility" that consumers may be misled is insufficient to prevail on an endorsement claim, *see Newton v. Thomason,* 22 F.3d 1455, 1461 (9th Cir.1994), the Court finds that factors in favor of finding a likelihood of confusion, the minimal evidence of actual confusion and convergent marketing channels, are outweighed by the factors weighing against such a finding. In particular, the weakness of association between Princess Diana's image and plaintiffs severely undermines plaintiffs' claim that defendants' use will cause confusion as to plaintiffs' endorsement. The Court concludes that, based on the evidence before it, there is no likelihood of confusion as to plaintiffs' endorsement based on defendants' use of Princess Diana's image and the words "Diana, Princess of Wales." Defendants are entitled to summary adjudication of plaintiffs' claim for false endorsement.

## IV. Plaintiffs' Claim for Dilution

Plaintiffs' complaint alleges that defendants' activities dilute Princess Diana's title "by lessening [their] capacity to identify and distinguish Plaintiff's charitable services." Second Amended Comp. ¶ 26. Because there is no evidence that defendants ever used the name "Diana,

Princess of Wales Memorial Fund," the Court will limit its discussion to the mark "Diana, Princess of Wales."

This Court found the allegations in plaintiffs' complaint sufficient to state a claim for dilution under § 1125(c)(1) because it alleged "(1) their marks, 'Diana, Princess of Wales' and 'Diana, Princess of Wales Memorial Fund' are famous; (2) defendants are using the marks commercially; (3) defendants' use commenced after the mark became famous; and (4) defendants' use of the marks dilutes their quality by diminishing the capacity of the marks to identify and distinguish plaintiffs' charitable services." *Lord Simon Cairns,* 24 F.Supp.2d at 1035 citing *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1324 (9th Cir.1988) (setting forth the elements of a dilution claim)(footnote omitted).

For a name or title to qualify for protection under the Federal Trademark Dilution Act, it must have a secondary meaning. 15 U.S.C. § 1052(e)(4); *see also* 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 13:1 (4th ed.1996). Plaintiffs argue that because Princess Diana is well-known for her charitable activities, her title has acquired a secondary meaning as to charitable and humanitarian services.

In this case, secondary meaning would occur when, "in the minds of the public, the primary significance of a [mark]" identifies charitable and humanitarian services rather than Princess Diana the individual. *See Wal–Mart Stores, Inc., v. Samara Brothers Inc.,* —— U.S. ——, ——, 120 S.Ct. 1339, 1343, 146 L.Ed.2d 182 (2000) (citation omitted); *Visser v. Macres,* 214 Cal.App.2d 249, 253, 29 Cal.Rptr. 367 (1963) (secondary meaning does not attach as a word identifying goods or services until the goods or services submerge the primary meaning of the name as a word identifying a person).

Although Princess Diana is certainly well-recognized for her humanitarian work and fund-raising, she is undisputably also well-recognized for her status as a member of the royal family, her role as a mother,

and her image as a fashionable princess. A finding of secondary meaning in this case would mean that the words "Diana, Princess of Wales" would no longer primarily identity the individual, Princess Diana, but instead identify plaintiffs' charitable activities. This is an absurd contention to say the least. "Diana, Princess of Wales" has not, and the Court suspects, will never, acquire a secondary meaning limited to charitable works. *See, e.g., Chamberlain v. Columbia Pictures Corp.,* 186 F.2d 923, 925 (9th Cir.1951) (strong primary meaning of Mark Twain incapable of acquiring a secondary meaning in connection with literary property).

Because secondary meaning is required for an otherwise descriptive name to be "famous," and famousness is required for protection under 15 U.S.C. § 1125(c)(1), defendants are entitled to summary adjudication of plaintiffs' claim for dilution.

## V. Plaintiffs' Claims for False Advertisement

■ To prevail on its false advertising claim under § 43(a), plaintiffs must demonstrate that: (1) defendants made a false statement of fact in a commercial advertisement; (2) the statement actually deceived or has the tendency to deceive a substantial segment of the audience; (3) the deception was material, in that it was likely to influence the purchasing decision; (4) the defendants caused their false statement to enter interstate commerce; and (5) plaintiffs have been or are likely to be injured as a result of the false statement by a lessening of the goodwill associated with their product. *See Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir.1997).

Plaintiffs' complaint alleges a false advertising claim under the Lanham Act based on "misleading and deceptive representations concerning the use of proceeds from the sale of Defendants' products." Second Amended Comp. ¶ 36. Specifically, plaintiffs contend that the statements "100% of. the ... price [of Defendants' dolls and plates] will be donated to Diana,

Princess of Wales' charities" and that "all proceeds go to Diana, Princess of Wales' Charities" are false. *Id.* Plaintiffs argue that these statements are false because defendants have retained "many times more from their sales of Princess Diana merchandise than they have 'pledged' to charity." Opposition at 24.

Among the many advertisements presented to the Court, only one states that 100% of the proceeds will go to Princess Diana's favorite charities: the tribute plate advertisement. *See* Friedman Dec., Ex. 32. Uncontroverted evidence demonstrates that defendants have contributed $1,538,640 to the Great Ormond Street Children's Hospital and have interpleaded with the Court another $2,527,107 to be given to charity upon resolution of this lawsuit. *See* Friedman Dec., Ex. 33, Listman Dep. at 516:21–25–517:1–9. Deborah Listman, defendants' employee, explained that the amount of money donated to charity reflected the amount of "cash collected for [the tribute] plate where the advertisement said we were going to be remitting the cash to the charity." *Id.* at 518:20–24.

The uncontroverted evidence demonstrates that defendants' statement used to advertise defendants' tribute plates "100% of your purchase price will be donated Diana, Princess of Wales' favorite charities" is literally true. Plaintiffs point to no other advertisement in support of their false advertising claim.

In the Statement of Genuine Issues plaintiffs state "in fact no such donations were made" and that defendants were not pledging a minimum of $4 million worldwide to charity. *See* ¶¶ 48, 60. Plaintiffs point to no evidence to support their contention that defendants have not made contributions to charity and, in light of the evidence presented by defendants in support of summary judgment, these statements are plainly unwarranted.

6. The Court's conclusion as to plaintiffs' claim for false advertising under 15 U.S.C. § 1125(a) governs plaintiffs' claim under Cali-

Defendants are entitled to summary adjudication of plaintiffs' claim for false advertising under 15 U.S.C. § 1125(a).[6]

### VI. Conclusion

Because defendants are entitled to summary adjudication on each of plaintiffs' remaining claims, defendants' motion for summary judgment filed April 3, 2000 is granted. Plaintiffs' three motions for summary adjudication on defendants' affirmative defenses filed April 3, 2000, are moot and are removed from the Court's docket.

IT IS SO ORDERED.

fornia Business Code § 17200 which is based on the same conduct by defendants.